998 F.2d 1491
 39 Fed. R. Evid. Serv. 320
 UNITED STATES of America, Plaintiff-Appellee,
v.
David ARIAS-VILLANUEVA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos Humberto ORANTES-ARRIAGA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Adolfo PLANCARTE-RAYA, Defendant-Appellant.
 Nos. 91-30393, 91-30403 and 92-30280.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 1, 1993.
Decided July 20, 1993.
 
 Mark Bennett Weintraub, Weintraub & Halley, Phillip M. Margolin, Margolin & Margolin, Philip A. Lewis, Portland, OR, for defendants-appellants.
 Johnathan S. Haub, Asst. U.S. Atty., Portland, OR, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: TANG, POOLE, and RYMER, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 Appellants David Arias-Villanueva, Carlos Humberto Orantes-Arriaga and Adolfo Plancarte-Raya appeal their convictions and sentences for conspiracy to possess with the intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and related charges. We find that their arguments on appeal afford them no relief and therefore affirm their convictions and sentences.
 
 I.
 
 2
 Over the course of several years, law enforcement officials obtained the following evidence against the three defendants:
 
 
 3
 On February 28, 1986, Drug Enforcement Administration (DEA) agents and Oregon law enforcement officials, in the course of an investigation of heroin trafficking, served 28 search warrants on Orantes-Arriaga's home in Lake Oswego, Oregon. The agents and officials seized several handguns, marijuana, cocaine, heroin and approximately $30,000 during their search.
 
 
 4
 Orantes-Arriaga was arrested later that year on unrelated charges. After his arrest, Orantes-Arriaga admitted that he was a member of a heroin trafficking enterprise transporting heroin from Guatemala to several cities in the United States: Portland, Oregon; Seattle, Washington; Oakland, California; and San Francisco, California. Orantes-Arriaga also admitted that he used motel rooms to stash the heroin that he imported into the United States and conducted his transactions in motel rooms. Orantes-Arriaga further admitted that he had conducted transactions under many aliases and normally transferred three to four million dollars per month to Mexico from his United States heroin transactions.
 
 
 5
 Upon his release from incarceration in Texas on September 25, 1987, Orantes-Arriaga was deported. Orantes-Arriaga later returned to the United States and was seen with Arias-Villanueva in Texas, Oregon and Washington at various times during late 1989 and early 1990. Wire transfers traced to the heroin enterprise were made from Texas to Portland during this time period.
 
 
 6
 Both before and after Orantes-Arriaga's return to the United States, Plancarte-Raya supervised a network which distributed and sold heroin, in Portland from 1985 to 1987, and, along with Arias-Villanueva, in Seattle from 1988 to 1989. Plancarte-Raya transferred profits from his sales to Orantes-Arriaga in Mexico after Orantes-Arriaga was deported.
 
 
 7
 On January 19, 1990, DEA agents enlisted the cooperation of Brian Boyer, one of Orantes-Arriaga's former employees. In January 1990, Orantes-Arriaga told Boyer that he had a contact at the Oregon Department of Motor Vehicles who would provide false licenses and identifications for $500. On February 26, 1990 and March 1, 1990, United States Customs Service (USCS) Agent Ann Harkonen, posing undercover as Boyer's girlfriend, accompanied Boyer to the Department of Motor Vehicles where Boyer purchased false licenses.
 
 
 8
 On January 24, 1990, Boyer met with Orantes-Arriaga in Portland and Orantes-Arriaga told Boyer that he intended to have a person in Portland killed. Orantes-Arriaga asked Boyer to obtain a gun for the intended murder. It was later discovered that the person Orantes-Arriaga intended to have killed was George Elias, who had been an informant for the DEA in 1986 and 1987 and provided information which led to the arrest of Julian Duarte, who managed Orantes-Arriaga's heroin enterprise while Orantes-Arriaga was incarcerated in Texas. When he was contacted, Elias confirmed having had threats made on his life.
 
 
 9
 On January 27, 1990, Boyer was instructed by law enforcement officials to volunteer to perform the killing. When Boyer went to Orantes-Arriaga's motel room and made the suggestion, Orantes-Arriaga told him that he had already enlisted two "professional killers," one of whom was identified as Raul Valencia-Mazariegos, a member of the enterprise who was staying in an adjacent motel room. During their discussion, Orantes-Arriaga made a motion toward Arias-Villanueva which Boyer interpreted to mean that Arias-Villanueva would also be involved in the murder.
 
 
 10
 Valencia-Mazariegos left his motel room on January 28, 1990 carrying a doughnut box and walked to the trunk of a Dodge with Oregon license plate "HMF 131." Valencia-Mazariegos placed the box inside the trunk. Valencia-Mazariegos and the other person then left the motel in a taxicab. After leaving the taxicab, Valencia-Mazariegos was arrested. The trunk of the Dodge parked outside of the motel was later searched and two handguns were found inside the doughnut box.
 
 
 11
 On January 29, 1990, Orantes-Arriaga, Arias-Villanueva and others were stopped by Portland Police Officer William Gray for a traffic violation. Orantes-Arriaga and Arias-Villanueva both produced false licenses. Orantes-Arriaga gave Gray permission to search his vehicle and instructed the others to cooperate. Gray searched Orantes-Arriaga and the others, took pictures of them, but did not arrest them. The encounter lasted 20 to 30 minutes.
 
 
 12
 On January 30, 1990, Valencia-Mazariegos was bailed out by Orantes-Arriaga and Ramon Fierro-Gaxiola, another member of the enterprise. Later that same day, Boyer went to Orantes-Arriaga's motel room in Portland and met with him, Arias-Villanueva, Valencia-Mazariegos and Fierro-Gaxiola. Boyer was instructed to obtain an apartment for Fierro-Gaxiola. Boyer met with Fierro-Gaxiola on February 8, 1990 and gave him door and mailbox keys for an apartment near McCormick Pier in Portland.
 
 
 13
 After independently connecting the McCormick Pier apartment with heroin sales, Gray applied for a search warrant while other officers, including Officer Sue Kruger, secured the apartment. While the apartment was being secured, Orantes-Arriaga and Arias-Villanueva approached, walking to within 15 feet of the stairway leading to the apartment. Kruger explained that there had been some trouble in the area and asked the two where they were headed. They replied that they were going to see some girls in a nearby apartment. Kruger checked their identifications and allowed them to leave after 30 to 40 minutes. Kruger later found a key for the apartment in the back seat of the squad car in which Orantes-Arriaga and Arias-Villanueva had been sitting.
 
 
 14
 The search of the apartment led to the seizure of almost one pound of heroin, packaging materials and $6,700 in cash. On February 17, 1990, after the search of the apartment, Orantes-Arriaga, Arias-Villanueva and Fierro-Gaxiola met Boyer and Harkonen, still posing as Boyer's girlfriend, outside the apartment. When Fierro-Gaxiola, after searching the apartment, discovered that the heroin and the money were missing, Orantes-Arriaga became upset and ordered Boyer and Harkonen to leave.
 
 
 15
 On May 2, 1990, Plancarte-Raya was arrested for selling heroin. It was later learned that Plancarte-Raya and his wife, Kathleen Benson, received approximately six deliveries of between 10 and 30 ounces of heroin at their home between February and May 1990 and received payments of between $10,000 and $20,000 for the sale of this heroin. Arias-Villanueva later admitted that he retrieved 20 ounces of heroin from Plancarte-Raya's house following Plancarte-Raya's arrest.
 
 
 16
 Orantes-Arriaga and Arias-Villanueva were arrested on November 2, 1990 after accepting $20,000 from Boyer for a delivery of 30 ounces of cocaine. Arias-Villanueva confessed after being Mirandized that he and Orantes-Arriaga were involved in heroin trafficking, that he had known Orantes-Arriaga for three years, that he had possessed and transferred heroin money, that he and Orantes-Arriaga had left a key to the McCormick Pier apartment in the police car, and that he had possessed a false drivers license. Arias-Villanueva never confessed or otherwise admitted that he was involved with any heroin dealing in Texas or in the planned murder of Elias.
 
 II.
 
 17
 The defendants raise the following issues regarding the legality of their convictions:
 
 A. The Suppression Motions
 
 18
 The defendants argue that the district court erred in denying their motions to suppress. The ultimate conclusion of the legality of a seizure is a mixed question of law and fact that we review de novo. United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir.1989). We review the underlying facts as found by the district court for clear error. United States v. Espinosa, 827 F.2d 604, 608 (9th Cir.1987), cert. denied, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988).
 
 
 19
 Orantes-Arriaga and Arias-Villanueva challenge the legality of the seizure of evidence during the January 29, 1990 encounter. They contend the evidence was seized during an illegal stop and detention. The government may stop and question any individual for any reason as long as the person to whom questions are put remains free to disregard the questions and walk away; such an encounter is not a seizure. United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Evidence seized during a consensual encounter is admissible. See Florida v. Royer, 460 U.S. 491, 505, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983). On the other hand, if the officer restrains an individual's ability to leave or limits his freedom to control his property, he is justified in doing so only in the presence of reasonable suspicion. See Florida v. Rodriguez, 469 U.S. 1, 5, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984) (per curiam); United States v. Ayarza, 874 F.2d 647, 650 (9th Cir.1989), cert. denied, 493 U.S. 1047, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990).
 
 
 20
 The district court found that there was no stop and that the encounter between the defendants and the police was voluntary and consensual. Voluntariness is a question of fact determined from all of the surrounding circumstances. United States v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir.1985), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); United States v. Patino, 649 F.2d 724, 728 (9th Cir.1981). The district court's finding is not clearly erroneous: the defendants were not pulled over, were in a public place, and were not handcuffed. Furthermore, Orantes-Arriaga instructed Arias-Villanueva and the others who were present to cooperate and was himself cooperative throughout the encounter. These factors suggest that the consent to the police procedures was voluntary. Cf. United States v. Moreno, 742 F.2d 532, 535 (9th Cir.1984) (determining that encounter where defendant was taken to the DEA office without being told he was free to leave, where a DEA agent had control of the defendant's luggage and where the defendant had a limited command of English was involuntary). Because it properly determined that the encounter was consensual,[1] the district court did not err in denying this motion to suppress.
 
 
 21
 Arias-Villanueva and Orantes-Arriaga also challenge the seizure of the key that was left in the police car following the February 16, 1990 encounter. They again argue that the police, who were securing the apartment while a search warrant was being procured, illegally stopped and detained them.
 
 
 22
 The key was not seized during the February 16 encounter but was unwittingly left in the police car. Orantes-Arriaga and AriasVillanueva were never searched; they had no incentive to leave the key in the police car. The totality of the circumstances therefore shows that the key was abandoned. The defendants thus lack standing to challenge the seizure of the key. See United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir.1986).
 
 
 23
 Plancarte-Raya argues that the district court erred in denying his motion to suppress the evidence seized during the November 2, 1990 search of his residence. However, this issue is moot because the government did not introduce any evidence seized during that search at trial. See United States v. King, 532 F.2d 505, 510 (5th Cir.), cert. denied, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976) (holding that a suppression motion was rendered moot when the evidence seized was excluded on other grounds).
 
 
 24
 B. Mistrial Based on Witness' Giving Opinion on Guilt
 
 
 25
 All three defendants argue that the district court erred in not granting their mistrial motions based on Benson's testimony. Benson testified for the government at trial and stated that she was "just as guilty as everyone else in this room." We review this issue for an abuse of discretion. United States v. Marsh, 894 F.2d 1035, 1040 (9th Cir.), cert. denied, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1048 (1990). Such a nonconstitutional error only merits reversal if it was more 'probable than not' that it affected the verdict. United States v. Soulard, 730 F.2d 1292, 1296 (9th Cir.1984).
 
 
 26
 The district court gave a prompt limiting instruction during Benson's testimony and gave another curative instruction at the close of evidence. While Benson's testimony was inadmissible and improper, see United States v. Kinsey, 843 F.2d 383, 388 (9th Cir.), cert. denied, 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988); Federal Rule of Evidence 704, the district court's timely and repeated efforts to cure were sufficient. See United States v. Smith, 790 F.2d 789, 793 (9th Cir.1986); United States v. Halbert, 640 F.2d 1000, 1004 (9th Cir.1981) (per curiam). Furthermore, the evidence against the defendants is substantial enough to insure that even if admission of Benson's testimony was error, the error was nonetheless harmless. See United States v. Baskin, 886 F.2d 383, 387-88 (D.C.Cir.1989), cert. denied, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990); United States v. Kirkland, 637 F.2d 654, 656 (9th Cir.1980).
 
 
 27
 C. Admission of Evidence Regarding Murder Conspiracy
 
 
 28
 Arias-Villanueva and Plancarte-Raya argue that the district court erred in admitting Boyer's testimony of Orantes-Arriaga's statement regarding the plan to murder Elias because the testimony was not admissible under Federal Rule of Evidence 801(d)(2)(E). We review "de novo the legal question of whether the government established a prima facie showing of conspiracy but apply a clearly erroneous standard in reviewing whether a challenged statement was made in the course and furtherance of a conspiracy." United States v. Smith, 893 F.2d 1573, 1577 (9th Cir.1990).
 
 
 29
 An out-of-court statement by a coconspirator is admissible if (1) there is independent evidence of the existence of a conspiracy, (2) the statement was made in furtherance of the conspiracy, and (3) the statement was made during the course of the conspiracy. United States v. Patterson, 819 F.2d 1495, 1503 (9th Cir.1987) (citation omitted). The defendants dispute the second element of this tripartite test. To be in furtherance of the conspiracy and admissible under 801(d)(2)(E), the statement must further the common objectives of the conspiracy. United States v. Nazemian, 948 F.2d 522, 529 (9th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). The declarant's intent and not the actual effect is what is important. Id. (citation omitted). While mere conversations or narrative declarations are not admissible under this rule, statements made to induce enlistment, further participation, prompt further action, allay fears or keep coconspirators abreast of an ongoing conspiracy's activities are admissible. United States v. Yarborough, 852 F.2d 1522, 1535-36 (9th Cir.), cert. denied, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988) (citations omitted).
 
 
 30
 The district court's ruling was not clearly erroneous. The plan to murder Elias was not merely an unrelated vendetta of Orantes-Arriaga's. Elias' murder arguably served several purposes in furtherance of the charged conspiracy. First, it showed current members of the conspiracy what would happen to those who become informants. Second, the planned murder protected the current objectives of the conspiracy by eliminating a source of evidence. Both of these potential purposes reasonably furthered the conspiracy because they served to insure its continuity. See Id.; Patterson, 819 F.2d at 1504; United States v. Friedman, 593 F.2d 109, 116 (9th Cir.1979) (holding that an ostensibly narrative statement regarding missing profits similarly served to further the conspiracy). The district court properly admitted Boyer's testimony.
 
 
 31
 D. Admission of Hearsay Evidence of Money Transfers
 
 
 32
 Arias-Villanueva and Plancarte-Raya argue that the district court erred in admitting a collection of Western Union money transfer records because the records were not introduced based on the personal knowledge of someone having a duty to keep them. We review the district court's exclusion of evidence under the hearsay rule for an abuse of discretion. United States v. George, 960 F.2d 97, 99-100 (9th Cir.1992).
 
 
 33
 Business records are not self-authenticating. For the records to be admissible, the following foundational facts must be proved by a qualified witness: (1) the records must have been made or transmitted by a person with knowledge at or near the time of the incident recorded; and (2) the record must have been kept in the course of a regularly conducted business. Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 717 (9th Cir.1990). A qualified witness can be anyone who understands the record-keeping system. United States v. Ray, 930 F.2d 1368, 1370 (9th Cir.1990), cert. denied, 498 U.S. 1124, 111 S.Ct. 1084, 112 L.Ed.2d 1189 (1991); United States v. Miller, 771 F.2d 1219, 1237 (9th Cir.1985).
 
 
 34
 The Western Union manager who testified for the government at trial testified that he did not know "who filled out the particular document and whether that person really had knowledge of the events that were purportedly being reported in the document." However, such knowledge is not necessary. "There is no requirement that the government establish when and by whom the documents were prepared." Ray, 930 F.2d at 1370. The record's being recorded at or near the time of the event it records is sufficient. Id. (citation omitted). Therefore, the district court properly admitted the wire transfer records.
 
 
 35
 E. Acquittal Motion on Aiding and Abetting Charge
 
 
 36
 Arias-Villanueva argues that there was no evidence supporting the charge of possession with the intent to distribute the one pound of heroin found in the McCormick Pier apartment on February 16, 1990. In considering a challenge to the sufficiency of the evidence, we decide, after viewing the evidence in the light most favorable to the government, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. U.S. v. Aichele, 941 F.2d 761, 763 (9th Cir.1991) (citation omitted). The government's evidence need not exclude every reasonable hypothesis consistent with innocence in order to satisfy this burden. United States v. Bishop, 959 F.2d 820, 830 (9th Cir.1992).
 
 
 37
 The only potential basis for finding Arias-Villanueva guilty of this charge is as an aider and abettor. A defendant is liable as an aider and abettor, and also thus as a principal, if he associates himself with the criminal venture, participates in it as in something that he wishes to bring about and seeks by his action to make it succeed. See United States v. Sanchez-Mata, 925 F.2d 1166, 1169 (9th Cir.1991) (citations omitted); 18 U.S.C. § 2(a). The aider and abettor's criminal intent may be inferred from the attendant facts and circumstances and need not be established by direct evidence. United States v. Reese, 775 F.2d 1066, 1072 (9th Cir.1985).
 
 
 38
 Although there is no direct evidence of Arias-Villanueva's ever being inside the apartment from which the heroin was seized, there is sufficient evidence to show that he aided and abetted in the possession and intended distribution of that heroin. First, Arias-Villanueva accompanied Orantes-Arriaga and others to the apartment on two occasions, on February 16 and on February 17, 1990. Second, a key to the apartment was found in the back seat of the police car where Arias-Villanueva and Orantes-Arriaga sat on February 16. Third, Arias-Villanueva had a long-standing relationship with Orantes-Arriaga and the heroin enterprise both before and after the seizure of heroin. These facts are sufficient to support a reasonable determination of Arias-Villanueva's possession, knowledge and intent to distribute. See United States v. Savinovich, 845 F.2d 834, 837-38 (9th Cir.), cert. denied, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); United States v. Smith, 832 F.2d 1167, 1170-72 (9th Cir.1987) (holding that a defendant's past and subsequent dealings could have supported the jury's belief that he was involved in an ongoing scheme of which the charged offense was a part). Thus, the evidence was sufficient to show that Arias-Villanueva was an aider and abettor in the charged offense.
 
 
 39
 F. Mistrial Based on Orantes-Arriaga's Testimony
 
 
 40
 Arias-Villanueva argues that the district court erred in denying his mistrial and severance motions based on Orantes-Arriaga's testifying at trial. Orantes-Arriaga testified on direct examination and several times asserted his Fifth Amendment right to remain silent on cross-examination. The district court instructed the jury that this assertion could be considered in evaluating Orantes-Arriaga's credibility.
 
 
 41
 Arias-Villanueva first contends that this instruction prejudiced him because the instruction enabled the jury to devalue Orantes-Arriaga's potentially exculpatory testimony. The mere possibility of such an occurrence, however, is not prejudicial. See United States v. Ramirez, 710 F.2d 535, 546-47 (9th Cir.1983) (citing United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.), cert. denied, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980)). Arias-Villanueva also contends that the jury interpreted his own failure to testify negatively as a result of the instruction. However, the district court gave a jury instruction to prevent such improper consideration. "Judicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence to each defendant." United States v. Vaccaro, 816 F.2d 443, 448 (9th Cir.), cert. denied, 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987). The district court properly denied this motion.
 
 
 42
 G. Jury Instruction Regarding Witness Credibility
 
 
 43
 Arias-Villanueva argues that the district court's instructing the jury that "every witness is presumed to speak the truth" when he did not testify or offer any witnesses violated his right to a presumption of innocence. We normally review this issue of law de novo. United States v. Gomez-Osorio, 957 F.2d 636, 642 (9th Cir.1992). We may also exercise our supervisory powers in determining that an instruction should be limited or prohibited even if it does not violate a statute or the constitution. United States v. Rubio-Villareal, 967 F.2d 294, 298 (9th Cir.1992) (en banc). However, because Arias-Villanueva did not object to this instruction at trial, we review for plain error. United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.), cert. denied, 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990); see also Estrella v. United States, 429 F.2d 397, 399 (9th Cir.1970), cert. denied, 400 U.S. 1011, 91 S.Ct. 575, 27 L.Ed.2d 624 (1971) (holding that requesting the court to exercise its supervisory powers should not aid the defendant when he has failed to raise the issue below). To merit reversal, such an error must affect a criminal defendant's substantial rights. Federal Rule of Criminal Procedure 52(b). Reversal based on plain error is exceptional and occurs only when necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process. United States v. Kennedy, 14 F.2d 968, 977 (9th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984) (citations omitted).
 
 
 44
 An instruction stating that witnesses are presumed to speak the truth does not violate due process. Cupp v. Naughten, 414 U.S. 141, 146-148, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973); United States v. Anderson, 642 F.2d 281, 286 (9th Cir.1981). However, we recently noted that such an instruction is disapproved. Rubio-Villareal 967 F.2d at 297 (citing United States v. Gutierrez-Espinosa, 516 F.2d 249, 250 (9th Cir.1975) (per curiam)). We, like many other circuits, have exercised our supervisory powers in disapproving the 'presumption of truth' instruction because "jurors are the sole judges of the credibility of witnesses and the weight to be given to their testimony. This important function should not be encumbered by an assumption that witnesses speak the truth." Id. (citation omitted).
 
 
 45
 The instruction at issue in this case was as follows:
 
 
 46
 The testimony of one witness, whom you believe, is sufficient to prove any fact in dispute. In other words, you are not simply to count the witnesses on each side; but you are to weigh the evidence. By "witness," I include any defendant who testifies.
 
 
 47
 Every witness is presumed to speak the truth. The presumption may be overcome by the manner in which the witness testifies, by the nature of his or her testimony, by evidence affecting his or her character, interest or motives, by contradictory evidence.
 
 
 48
 If you find that a witness has testified falsely in any one material part of his or her testimony, you may look with distrust upon the other evidence given by that witness. If you find that any witness has willfully testified falsely, then you are free to entirely disregard all the evidence given by that witness, unless corroborated by other evidence which you do believe.
 
 
 49
 There was no plain error in this case. While the disputed portion of the instruction is "confusing and useless," Gutierrez-Espinosa, 516 F.2d at 250, the instruction as a whole does not take the duty to make credibility determinations away from the jury. See Cupp, 414 U.S. at 149, 94 S.Ct. at 401-02 (holding that a similarly instructed jury "remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible"). Furthermore, while Arias-Villanueva did not himself offer any witnesses, some of his codefendants, particularly Orantes-Arriaga, offered testimony that was favorable to him, thereby allowing him to benefit from the erroneous instruction. See Gutierrez-Espinosa, 516 F.2d at 250 (finding no harmless error where instruction was advantageous to defendant). Finally, the evidence against Arias-Villanueva was substantial. See United States v. Rhodes, 713 F.2d 463, 476 (9th Cir.), cert. denied, 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 715 (1983). The district court's instruction does not require reversal.
 
 
 50
 H. Mistrial Based on Potential Jurors' Seeing Defendant in Custody
 
 
 51
 Arias-Villanueva argues that the district court's refusing to grant his mistrial motion based on some of the defendants being seen in custody by potential jurors during jury selection was error. We review the record to determine whether the knowledge by certain jurors that an accused is under restraint or in custody was so inherently prejudicial that the defendant was denied his constitutional right to a fair trial or, alternatively, whether the defendant has affirmatively shown actual prejudice. United States v. Halliburton, 870 F.2d 557, 560 (9th Cir.), cert. denied, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989).
 
 
 52
 There is obviously no error here. First, the district court explained the incident to the prospective jurors and asked whether it caused any of them concern. No prospective juror responded affirmatively. Questioning the jurors is the best method of determining prejudice. Id. at 561. Second, we have noted that jurors know that handcuffing defendants in a courthouse is a standard practice and have held "that a jury's brief, inadvertent observation of a defendant in custody does not compel reversal in the absence of an affirmative showing of actual prejudice." Id. (citation omitted). Third, there is no indication that any potential juror who saw the defendants in custody became a member of the jury in the case. For these reasons, the record falls far short of affirmatively showing prejudice. See id.; Wilson v. McCarthy, 770 F.2d 1482, 1485-86 (9th Cir.1985). The district court properly denied this mistrial motion.
 
 
 53
 I. New Trial Based on Government's Discovery Violation
 
 
 54
 Arias-Villanueva argues that the district court should have granted his motion for a new trial because the government withheld discoverable information until after trial. We review this ruling for an abuse of discretion. United States v. Steel, 759 F.2d 706, 713 (9th Cir.1985). We review alleged violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), de novo in order to determine whether the suppression of Brady material might have affected the outcome of the trial. United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992).
 
 
 55
 The information about which Arias-Villanueva complains appears in his presentence report. It states in relevant part that:
 
 
 56
 Arias-Villanueva's name first became known to investigators during the latter part of 1989 when information was received from San Diego, California that Arias-Villanueva had been taken into custody by the Mexican Federal Police.... [S]everal kilograms of heroin and approximately $125,000 in currency was [sic] seized.... Arias-Villanueva admitted that he worked for Carlos Orantes-Arriaga and during the preceding week he had forwarded approximately seven kilograms of heroin across the border at Tijuana into the United States.
 
 
 57
 The district court found that the information was not discoverable and that its nondisclosure was not prejudicial.
 
 
 58
 This information, which came from an unidentified informant, is blatant hearsay that would have been inadmissible at trial. It also tends to inculpate, not exculpate, Arias-Villanueva. Furthermore, this evidence was not presented as a part of Arias-Villanueva's prior criminal record. Therefore, it was not discoverable under Federal Rule of Criminal Procedure 16 or Brady. Since the information certainly would not have changed the result of the trial even if it had been disclosed, the district court also did not err in denying the new trial motion. See United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
 
 
 59
 J. Severance Motion Based on Antagonistic Defenses
 
 
 60
 Orantes-Arriaga argues that the district court should have severed his trial from one of his codefendants, who presented a duress defense based on Orantes-Arriaga's alleged coercion. Orantes-Arriaga contends that their defenses were mutually exclusive and that severance was required. See United States v. Polizzi, 801 F.2d 1543, 1553 (9th Cir.1986).
 
 
 61
 Generally, defendants jointly charged are jointly tried. United States v. Hernandez, 952 F.2d 1110, 1114 (9th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992). The district court's denial of severance is reviewed for an abuse of discretion, and a defendant seeking reversal has the burden of proving clear, manifest or undue prejudice from a joint trial. United States v. Joetzki, 952 F.2d 1090, 1094 (9th Cir.1991) (citations omitted). The evidence of prejudice must demonstrate that Orantes-Arraiga was denied a fair trial. See id. (citation omitted).
 
 
 62
 Orantes-Arriaga relies on his codefendant's presenting evidence supporting her duress defense that he, both directly and through others, coerced her into joining the conspiracy by threatening her and her family's lives. In Zafiro v. United States, --- U.S. ----, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court held that severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. --- U.S. at ----, 113 S.Ct. at 938. In Orantes-Arriaga's case, a severance is not warranted under Zafiro. The evidence introduced by his codefendant would have been admissible against Orantes-Arriaga even if he had been tried separately. Orantes-Arriaga, therefore, was not denied a specific trial right.
 
 
 63
 Additionally, it is clear that, at minimum, Orantes-Arriaga must show that acceptance of his codefendant's defense would preclude his acquittal. See United States v. Sherlock, 962 F.2d 1349, 1362 (9th Cir.1989), cert. denied, --- U.S. ----, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992); United States v. Buena-Lopez, 987 F.2d 657, 661 (9th Cir.1993). Orantes-Arriaga's defense was limited to his testimony on his torture by the Mexican Federal Police, allegedly with the Drug Enforcement Administration's complicity, and his counsel's closing argument. He submitted no theory of the defense jury instructions. Moreover, Orantes-Arriaga did not deny the existence of a conspiracy but merely disputed the extent of his involvement and contended that he should not be prosecuted based on his being tortured. Thus, Orantes-Arriaga's and his codefendant's defenses were not irreconcilable--both could have been either acquitted or convicted based on their theories of defense. While his codefendant's defense, if believed, could have inculpated Orantes-Arriaga, "the desire of one to exculpate [herself] by inculpating the other does not generate the kind of prejudice that requires severance." Sherlock, 962 F.2d at 1363 (citation omitted). Therefore, the district court did not err in denying Orantes-Arriaga's severance motion.
 
 K. Mistrial Based on Improper Argument
 
 64
 Orantes-Arriaga argues that the district court erred in not granting a mistrial because the prosecutor argued evidence not presented to the jury, in violation of the Confrontation Clause of the Sixth Amendment. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that the admission of a confession against a criminal defendant in a joint trial violated the codefendant's right of cross-examination secured by the Confrontation Clause).
 
 
 65
 In ruling on Orantes-Arriaga's motion in limine to exclude Arias-Villanueva's confession, the district court ordered that the witness who took the confession could only testify as to Arias-Villanueva's knowledge of Orantes-Arriaga and nothing more. The witness testified before the jury to the following on direct examination:
 
 
 66
 Q. Did you ask [Arias-Villanueva] if he knew Carlos Orantes?
 
 
 67
 A. Yes. I did.
 
 
 68
 Q. How long did he say he knew Carlos Orantes?
 
 
 69
 A. Three years.
 
 
 70
 Q. Did you ask him if he had personally trafficked heroin?
 
 
 71
 A. Yes. I did.
 
 
 72
 Q. What did he say?
 
 
 73
 A. He said, no. He didn't. That was done by others.
 
 
 74
 In characterizing this testimony during his closing argument, the prosecutor stated that Arias-Villanueva admitted "that he had known Orantes for three years. When asked if he dealt heroin with Orantes, he said no, that is done by others."
 
 
 75
 While severance is required where a nontestifying codefendant's confession is put in evidence, Bruton, 391 U.S. at 142, 88 S.Ct. at 1631, and such a confession is admissible only if all references to implicated codefendants are redacted, Richardson v. Marsh, 481 U.S. 200, 208-09, 107 S.Ct. 1702, 1707-08, 95 L.Ed.2d 176 (1987), the testimony did not violate Bruton. It only established that Orantes-Arriaga and Arias-Villanueva knew one another; this is not substantially incriminating. See Richardson 481 U.S. at 208, 107 S.Ct. at 1708; United States v. Sherlock, 962 F.2d at 1362. Moreover, Orantes-Arriaga did not object to this testimony. See United States v. Longee, 603 F.2d 1342, 1345 (9th Cir.1979) (noting that Bruton claim not raised at trial is reviewed for plain error). There certainly is no plain error in the district court's admission of the testimony.
 
 
 76
 The problem is with the prosecutor's argument, not the underlying testimony. The closing argument's characterization of Arias-Villanueva's confession explicitly incriminated Orantes-Arriaga, and had the confession itself done so, Orantes-Arriaga's Sixth Amendment right of confrontation would have been violated. See Richardson, 481 U.S. at 208, 107 S.Ct. at 1708. The characterization also constitutes improper argument, as it refers to matters outside of the record. See United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.1989), cert. denied, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 497 (1990); United States v. Vargas-Rios, 607 F.2d 831, 838 (9th Cir.1979). However, while incriminating, the fact that Orantes-Arriaga was a heroin dealer was presented to the jury through many other pieces of evidence. Such an error is harmless under either a Bruton or improper argument analysis. See Herd, 800 F.2d at 1529; Sherlock, 962 F.2d at 1364.
 
 L. Orantes-Arriaga's Cross-Examination
 
 77
 Orantes-Arriaga argues that the district court erred in allowing broad cross-examination when he only testified on direct concerning his torture by the Mexican Federal Police. We review the district court's ruling on the scope of cross-examination for an abuse of discretion. United States v. Simtob, 901 F.2d 799, 804 (9th Cir.1990) (citations omitted).
 
 
 78
 Orantes-Arriaga contends the following topics explored by the government constitute improper cross-examination: (1) his relationship with Arias-Villanueva; (2) his subsequent return to the United States; (3) his dealing drugs in Mexico; (4) his having assets or money in the United States; (5) his dealing drugs with Arias-Villanueva; and (6) his knowledge of the sale, manufacture or distribution of heroin. The government contends that all of these topics are reasonably related to the subject matter of Orantes-Arriaga's direct testimony.
 
 
 79
 Federal Rule of Evidence 611(b) states that "[c]ross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of [a] witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." We have held that "the trial court may permit cross-examination as to all matters reasonably related to the issues ... put in dispute by [a witness'] testimony on direct." United States v. Vasquez, 858 F.2d 1387, 1392 (9th Cir.1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978, and cert. denied, 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989) (citation and internal quotation omitted). In Vasquez we held that the defendant's direct testimony about the leaving his apartment on the day he was arrested allowed the government to cross-examine him concerning the evidence seized from his apartment. While these are obviously different topics, both direct and cross-examination concerned the apartment and were thus reasonably related. Id. at 1392.
 
 
 80
 This case is similar to Vasquez. All of the disputed areas into which the prosecutor inquired on cross-examination were reasonably related to Orantes-Arriaga's direct testimony. Orantes-Arriaga's relationship with Arias-Villanueva related to his testimony that he was forced to call Arias-Villanueva by the Mexican Federal Police and showed that he may have had myriad voluntary reasons to call his close associate. His voluntary return to the United States in 1990 related to his testimony that he believed the DEA and the Mexican government were conspiring for his return to the United States. His dealing drugs in Mexico related to his testimony detailing his lack of knowledge about drug dealers and drugs. The whereabouts of his money and assets related to his testimony regarding his release and payment of a ransom. His dealing drugs with Arias-Villanueva also related to his testimony regarding his lack of knowledge about drug dealing and his being interrogated about dealing drugs with Arias-Villanueva in Seattle. Finally, his knowledge of selling, making or distributing heroin also related to his asserted lack of knowledge about drug dealing. Thus, the district court did not err in finding that all of these areas were reasonably related to Orantes-Arriaga's testimony.
 
 
 81
 Orantes-Arriaga's reliance on United States v. Green, 648 F.2d 587 (9th Cir.1981), to support his argument that the scope of cross-examination was impermissibly broad is misplaced. Green states that "[to] the extent that evidence of the appellants' relationships with the other principals involved in the case answered relevant questions raised but left unanswered by [their testimony], it was within the embrace of direct examination and properly admissible." Id. at 594 (footnote omitted). While Green excluded cross-examination testimony violating Federal Rules of Evidence 403 and 404, those rules are not implicated by Orantes-Arriaga's cross-examination. None of the cross-examination referred to any prior crimes.
 
 
 82
 M. Acquittal Motion on False Identification Charge
 
 
 83
 Orantes-Arriaga contends that the evidence against him was insufficient to support convictions on the counts charging him with aiding and abetting in the production of false identification, in violation of 18 U.S.C. §§ 1028(a)(1) and (2), because there is no evidence that he aided and abetted in the production of five or more false identifications. This argument is without merit. There is no requirement that a defendant produce five or more false identifications; while section 1028(a)(3) makes the possession of five or more false identifications a federal offense, there is no basis for implying that restriction to provisions where Congress itself did not include it.
 
 
 84
 N. Acquittal Based on Improper Jurisdiction and Venue
 
 
 85
 Orantes-Arriaga argues that the district court erred in denying his acquittal motions with respect to the counts charging him with violating 21 U.S.C. § 843(b), use of a communications facility in the commission of a felony. Orantes-Arriaga contends that the district court lacked jurisdiction and venue was improper for these charges. According to Orantes-Arriaga, he should be acquitted of these counts because he did not make the calls, but only received them. Furthermore, he argues that he received them outside of the United States, and therefore the crime was not committed in the United States. See United States v. Rodgers, 575 F.Supp. 246 (N.D.Ill.1983).
 
 
 86
 The district court had jurisdiction over Orantes-Arriaga because his offense was committed in the United States. To establish a violation of section 843(b), "the government must establish knowing and intentional use of a communications facility ... [Use] occurs when a defendant either personally uses a telephone or instructs someone else to use one." United States v. Davis, 960 F.2d 820, 827 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992). That Brian Boyer, a government informant, made the calls to Orantes-Arriaga outside the United States is immaterial. "Use" of a telephone to facilitate the commission of a crime occurs at both ends of the line. Andrews v. United States, 817 F.2d 1277, 1279 (7th Cir.), cert. denied, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987). Orantes-Arriaga's use of the telephone falls within the scope of section 843(b).[2]
 
 
 87
 For the same reason, Orantes-Arriaga argument that venue was improper also fails. Federal Rule of Criminal Procedure 18 states "prosecution shall be had in a district in which the offense was committed." Since under section 843 the "use" of the telephones was committed both where the call was made and received, venue in Oregon was proper. The district court properly denied Orantes-Arriaga's mistrial motion.
 
 III.
 
 88
 The defendants raise the following issues regarding the legality of their sentences:
 
 
 89
 A. Sentence Enhancement Pursuant to 21 U.S.C. § 841(b)(1)(A)(i)
 
 
 90
 Arias-Villanueva and Plancarte-Raya argue that the district court erred in finding that 21 U.S.C. § 841(b) does not require notice of enhancement penalties based upon the drug quantity and that, in any event, adequate notice was given. We review the legality of a sentence de novo. United States v. Turner, 898 F.2d 705, 708 (9th Cir.), cert. denied, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990). We review underlying factual determinations for clear error. United States v. Restrepo, 884 F.2d 1294, 1295 (9th Cir.1989).
 
 
 91
 Absent any specification of the weight of the heroin possessed and distributed as the object of the conspiracy charged against him, the maximum sentences that could be imposed on the defendants for their conspiracy convictions would be 20 years. 21 U.S.C. § 841(b)(1)(C). We have not previously decided if a defendant is entitled to notice of the government's intent to seek the enhanced penalties provided in § 841(b). However, other circuits have held that due process requires that the defendant have sufficient notice of the basis for an enhancement sought under § 841(b). See United States v. Royal, 972 F.2d 643, 650 (5th Cir.1992); United States v. Levy, 955 F.2d 1098, 1106 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). In Royal the court held that, because quantity is not an element of § 841(a) and is therefore relevant at only at sentencing under § 841(b), see United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1186, 117 L.Ed.2d 428 (1992) (holding similarly), notice allowing a defendant to present evidence disputing the government's evidence concerning quantity at sentencing was sufficient. Royal, 972 F.2d at 650. In Levy the court noted that there does not appear to be any difference between the enhancement provisions under § 841(b) and the enhancement provisions found in the United States Sentencing Guidelines, which allow quantities of drugs not specified in the count of conviction to be considered in determining the offense level. Levy, 955 F.2d at 1106; U.S.S.G. § 2D1.1. The Levy court held that there was no indication that the defendant lacked sufficient time or opportunity to contest the sentence enhancement at the time of sentencing. Id.
 
 
 92
 The defendants' contention that notice must be given in the indictment or in an information filed before trial relies upon the explicit notice requirement for enhancement based on prior convictions, 21 U.S.C. § 851. However, there is no similar provision for enhancement based on the quantity of drugs. Moreover, such a provision would be contrary to the relevant sentencing guidelines, which do not require such notice. U.S.S.G. § 6A1.3(a) only requires an adequate opportunity to present information to the court regarding a disputed sentencing factor. While some sort of notice is required at sentencing in order to satisfy due process, cf. United States v. Borrero-Isaza, 887 F.2d 1349, 1352 (9th Cir.1989) (holding that sentencing proceedings must be consistent with due process), there is no basis for adopting a judicial rule similar to § 851. The reasoning of Royal and Levy is compelling: if a defendant received sufficient notice and had an opportunity to dispute enhancement based on quantity at the time of sentencing, due process is satisfied. We have approved similar notice for other types of sentence enhancements. See United States v. Alvarez, 972 F.2d 1000, 1006 (9th Cir.1992) (finding that the government's sentencing briefing provided sufficient notice of sentence enhancement under 18 U.S.C. § 924).
 
 
 93
 In any event, the notice given the defendants was sufficient. The government filed an Information to Enhance Sentence before trial which stated that, if convicted, the defendants would be subject to sentence enhancement based on their distribution and possession with the intent to distribute one kilogram of heroin. Contrary to the defendants' contention, this notice did not specify enhancement only for the possession with the intent to distribute counts; it refers to no specific counts. Additionally, the indictment alleged that an object of the conspiracy was the possession with the intent to distribute, in violation of § 841(a)(1); the enhancement notice thus applied to the conspiracy count. See Royal, 972 F.2d at 649 (making a similar determination). Furthermore, the presentence report and sentencing briefs made it clear that an enhancement would be sought based on the conspiracy conviction.
 
 
 94
 B. Sentencing Finding Regarding the Amount of Heroin
 
 
 95
 Arias-Villanueva and Plancarte-Raya argue that the district court erred in finding the amounts of heroin for which they were responsible and in determining their offense levels based on this determination. Both argue that they should have been held responsible for much smaller amounts of heroin. We review the application of the sentencing guidelines de novo and review the underlying findings of fact for clear error. United States v. Uzelac, 921 F.2d 204, 206 (9th Cir.1990) (citations omitted).
 
 
 96
 The district court found that Arias-Villanueva was responsible for 159.9 kilograms of heroin based on its findings that: (1) he entered the conspiracy in early 1988; (2) the records and cocaine seized indicated that the conspiracy was responsible for 29.4 kilograms of cocaine in Oregon and Washington between November 1989 and November 1990; (3) he knew about the conspiracy's activities in Texas; and (4) the conspiracy distributed 13 kilograms of heroin a month in Texas between January and October 1990.
 
 
 97
 Arias-Villanueva argues there is (1) no evidence connecting him with any of the conspiracy's activities in Texas and (2) no evidence of the sale of 13 kilograms of heroin a month in Texas between January and October 1990. Pursuant to U.S.S.G. § 1B1.3(a)(1), the offense level determination requires the district court to consider "all acts and omissions committed or aided and abetted by the defendant or for which the defendant would otherwise be accountable...." Under these criteria, a defendant is responsible for "the jointly undertaken criminal activity that was reasonably foreseeable by the defendant." § 1B1.3(a), note 1.
 
 
 98
 The district court found Arias-Villanueva had knowledge of Orantes-Arriaga's operations in Texas based on his presence in Texas in November 1989. This, along with all of the other evidence linking him with the conspiracy, is sufficient to imply his involvement in the Texas operations. See U.S. v. Aichele, 941 F.2d 761, 763-64 (9th Cir.1991) (citations omitted) (holding that a defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the codefendants' actions).
 
 
 99
 The district court's finding regarding the amount of heroin distributed in Texas is also not clearly erroneous. Orantes-Arriaga told Boyer in January 1990 that he was selling 20 kilograms a month in Texas. The district court accounted for Orantes-Arriaga's tendency to exaggerate the volume of his business and discounted this figure to 13 kilograms per month. There is also evidence of Orantes-Arriaga's conducting ongoing operations in Texas: he made wire transfers and phone calls to and from Texas. Therefore, the district court's finding that the Texas distributions continued until Orantes-Arriaga's arrest is supported by the evidence. The district court's findings regarding the amount of heroin for which Arias-Villanueva was responsible were proper.[3]
 
 
 100
 The district court found that Plancarte-Raya was accountable for 267.9 kilograms of heroin. The district court made this determination based on its findings that Plancarte-Raya (1) was a part of the conspiracy from 1985 through the final arrest and (2) was close to Orantes-Arriaga throughout the entire conspiracy. Both of the district court's findings are supported by the record. Plancarte-Raya supervised a network which sold heroin. Plancarte-Raya transferred profits from his network to Orantes-Arriaga. Plancarte-Raya also went to Mexico at Orantes-Arriaga's direction.
 
 
 101
 Plancarte-Raya's argument that he should not have been held responsible for heroin sold after his arrest is incorrect. Although Plancarte-Raya was arrested in May 1990, he was properly held responsible for subsequent transactions because there was no showing that he disavowed the conspiracy. See United States v. Johnson, 956 F.2d 894, 906-07 (9th Cir.), modified on other grounds, 969 F.2d 849 (1992). This is especially true because Plancarte-Raya was not merely a minor participant but played a managerial role in the conspiracy and had a close relationship with Orantes-Arriaga. See id.; United States v. Torres-Rodriguez, 930 F.2d 1375, 1389 (9th Cir.1991). The district court properly calculated his offense level based on 267.9 kilograms of heroin.[4]
 
 
 102
 C. Sentence Enhancement Based on Obstruction of Justice
 
 
 103
 Orantes-Arriaga and Plancarte-Raya argue that the district court erred in enhancing their sentences based on their trial testimony pursuant to U.S.S.G. § 3C1.1, which provides for a sentence enhancement for obstruction of justice. Both[5] argue that the record does not justify the district court's finding that they committed perjury.
 
 
 104
 In United States v. Dunnigan, --- U.S. ----, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Supreme Court held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do so under the perjury definition we have set out." Id., --- U.S. at ----, 113 S.Ct. at 1117. In defining perjury, the Court relied upon the traditional definition of perjury embodied in the federal criminal perjury statute, 18 U.S.C. § 1621. Id. --- U.S. at ----, 113 S.Ct. at 1116. A witness testifying under oath must therefore be found to give material false testimony with the willful intent to provide false testimony, rather than as the result of confusion, mistake or faulty memory. Id. The Court determined that the generalized finding[6] at issue was sufficient because it encompassed all the factual predicates for a finding of perjury but noted that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." Id. --- U.S. at ----, 113 S.Ct. at 1117.
 
 
 105
 Initially, we reject the contention that Dunnigan effectively overrules United States v. Barbosa, 906 F.2d 1366, 1369-70 (9th Cir.), cert. denied, 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990), in which we held that the district court was not required to make specific findings as to specific portions of a defendant's testimony it believes to be false. Indeed, the finding held sufficient by the Supreme Court in Dunnigan did not designate to any specific item of false testimony. See id. --- U.S. at ----, 113 S.Ct. at 1117. So long as the district court finds that a defendant's trial testimony satisfies the elements for perjury as set forth in Dunnigan, an enhancement for obstruction of justice is proper.
 
 
 106
 The district court found that Orantes-Arriaga testified untruthfully regarding the United States government's involvement in his Mexican arrest and generally found that he lied on the stand. This finding, similar to the finding in Dunnigan, indicates that Orantes-Arriaga's testimony was (1) false, (2) material and (3) willful. Because the record supports the district court's finding of perjury, it properly enhanced Orantes-Arriaga's sentence under section 3C1.1.
 
 
 107
 The district court found that Plancarte-Raya's testimony was solely for the purpose of obstructing justice. This finding sufficiently indicates, and the record further supports, that his testimony was false and willful. While the district court did not find that his false testimony was material, the record amply shows that Plancarte-Raya's testimony was relevant to the subsidiary issues under consideration at his trial. See United States v. Clark, 918 F.2d 843, 846 (9th Cir.1990). Despite the district court's failure to so find, Plancarte-Raya's testimony was clearly material.
 
 
 108
 Where the record allows us to make a determination regarding the district court's application of the sentencing guidelines, remand is unnecessary. Cf. United States v. Kemp, 938 F.2d 1020, 1024 (9th Cir.1991) (remanding because the state of the record did not allow for an appellate determination). Furthermore, whether a perjurious statement is material is an issue of law rather than an issue of fact, Clark, 918 F.2d at 846, and we therefore do not read Dunnigan as requiring remand to the district court solely for a determination of materiality. The district court thus properly enhanced Plancarte-Raya's sentence as well.
 
 
 109
 D. Denial of Reduction for Acceptance of Responsibility
 
 
 110
 Arias-Villanueva argues that the district court erred in denying him a reduction for acceptance of responsibility. The version of U.S.S.G. § 3E1.1(a) in effect at the time of his sentencing[7] provided a two level reduction in the offense level if "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." The district court found that Arias-Villanueva did not demonstrate the degree of acceptance necessary to qualify for this reduction. This finding is not clearly erroneous: Arias-Villanueva, while admitting to some involvement in the conspiracy, did not admit that his role was of the magnitude proved at trial, i.e., that he was involved in the plan to murder Elias and in the Texas heroin distribution or that he was Orantes-Arriaga's close advisor. Such a limited acceptance of responsibility is not sufficient to qualify for the reduction. See United States v. Morales, 972 F.2d 1007, 1010 (9th Cir.1992) (denying a reduction to a defendant who pled guilty but denied knowledge of methamphetamine).
 
 E. Sentence Enhancement Based on Firearms
 
 111
 Arias-Villanueva argues that the district court erred in increasing his offense level pursuant to U.S.S.G. § 2D1.1(b)(1) because there is no evidence that he owned, controlled or was aware of any of the guns used during the conspiracy. The district court increased Arias-Villanueva's offense level because of conduct of others in furtherance of the jointly-undertaken criminal activity that was reasonably foreseeable to the defendant. See U.S.S.G. § 1B1.3, note 1. The court found that Valencia-Mazariegos' possession of the firearm during the plan to kill Elias was reasonably foreseeable to all of the defendants. Cf. United States v. Kelso, 942 F.2d 680, 682 n. 3 (9th Cir.1991) (noting that foreseeability of the use of a gun by a coconspirator would be sufficient basis for application of the enhancement). This is especially true in Arias-Villanueva's case because he was in the room when the plan to kill Elias was discussed between Orantes-Arriaga and Boyer. The district court's enhancement was justified.
 
 
 112
 F. Sentencing Finding Regarding Managerial Role
 
 
 113
 Plancarte-Raya argues that the district court erred in finding that he played a managerial role in the conspiracy and in enhancing his sentence pursuant to U.S.S.G. § 3B1.1(b) based on this finding. Section 3B1.1 applies only when the offense involves more than one person criminally responsible for the offense. United States v. Anderson, 942 F.2d 606, 615 (9th Cir.1991) (en banc); United States v. Helmy, 951 F.2d 988, 997 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2287, 119 L.Ed.2d 211 (1992). Section 3B1.1(b) provides that a defendant's offense level should be increased by three levels if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive.
 
 
 114
 The district court's finding and resultant enhancement were proper. The evidence at trial showed that Plancarte-Raya supervised a heroin network consisting of several persons, two of whom were charged in the same indictment, Kathleen Benson and Ramon Fierro-Gaxiola. While Plancarte-Raya was not the organizer or leader of the conspiracy, his role as the manager of the heroin sales network was sufficient to support the section 3B1.1(b) enhancement he received.
 
 
 115
 G. Denial of Downward Departure for Lesser Role
 
 
 116
 Plancarte-Raya argues that the district court erred in denying his request for a downward departure to make his sentence commensurate with those of his codefendants whom he argues were similarly culpable. Plancarte-Raya relies on 18 U.S.C. § 3553(a)(6), which states that district courts shall consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[8]
 
 
 117
 At sentencing the district court judge stated that "while there may be an opportunity to exercise my discretion for departure in this case, I do not." "[A] sentencing court's decision not to depart from the guidelines is not reviewable unless the decision resulted from a legal determination that the guidelines prevented departure." United States v. Brown, 985 F.2d 478, 480 (9th Cir.1993) (citing 18 U.S.C. § 3742(e)(2)). We have no jurisdiction to address Plancarte-Raya's argument that the disparity between his and two of his codefendants' sentences is fundamentally unfair because he was sentenced within the applicable guideline range. See id.[9]
 
 
 118
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 In recognizing that the encounter was consensual, we reject Orantes-Arriaga's argument that his consent was tainted
 
 
 [2]
 Furthermore, even if Orantes-Arriaga's offense arguably occurred outside of the United States, section 843(b), which is a part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, has extraterritorial application because "illegal drug trafficking, which the statute is designed to prevent, regularly involves importation of drugs from international sources." United States v. Larsen, 952 F.2d 1099, 1101 (9th Cir.1991)
 
 
 [3]
 Arias-Villanueva argues that the district court was required to find the facts relative to the offense level beyond a reasonable doubt, but the district court properly applied the preponderance of the evidence standard. See United States v. Restrepo, 946 F.2d 654, 656-57 (9th Cir.1991) (en banc)
 
 
 [4]
 Plancarte-Raya further contends that his case should be remanded for resentencing because the most recent version of U.S.S.G. § 1B1.3, effective November 1, 1992, is more favorable to him. Assuming, despite the appearance to the contrary, that there has been a favorable modification in the most recent version of this section, it has no application in this case. Plancarte-Raya was sentenced on June 8, 1992, five months before the amendment. The district court had to apply the sentencing guidelines in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4)
 
 
 [5]
 Orantes-Arriaga's additional argument that he received insufficient notice is inapposite. U.S.S.G. § 6A1.3(a) only requires an adequate opportunity to present information to the court regarding a disputed sentencing factor. Orantes-Arriaga unquestionably had sufficient notice. He was notified of the government's intent to seek an enhancement for obstruction of justice on September 24, 1991, more than one month before sentencing. This is sufficient notice under United States v. Brady, 928 F.2d 844, 847 (9th Cir.1991) (holding that notice before sentencing is required)
 
 
 [6]
 The sentencing finding at issue in Dunnigan stated that "the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels." United States v. Dunnigan, --- U.S. ----, ----, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993)
 
 
 [7]
 Section 3E1.1(a) was amended effective November 1, 1992 and now states that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by two levels."
 
 
 [8]
 Although the district court made no specific comparative findings, it did find that the factors supporting a departure for the other defendants were not existent in Plancarte-Raya's case. A review of the record shows that Plancarte-Raya was more culpable than the other defendants: Plancarte-Raya had a prior criminal history, was older and had a longer association with the conspiracy
 
 
 [9]
 Furthermore, even if Plancarte-Raya's claim were reviewable, departing strictly in order to equalize punishment among codefendants is impermissible. See United States v. Mejia, 953 F.2d 461, 467-68 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992)