UNITED STATES of America,
Plaintiff–Appellee,

v.

Ernesto SEGURA–GALLEGOS,
Defendant–Appellant.

No. 92–50253.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 16, 1994.

Decided Nov. 14, 1994.

---

**1268**

Andrew French Loomis, and Spencer W. Strellis, Oakland, CA, for defendant-appellant.

John J. Byrne, Jr., Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: HUG, SCHROEDER and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Ernesto Segura–Gallegos appeals his convictions for conspiracy to possess with intent to distribute cocaine and for possession with intent to distribute cocaine. Segura–Gallegos was the passenger in a van used as a lookout during a cocaine transaction with an undercover officer. After trial, a jury found Segura–Gallegos guilty of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a) (1988), and of possession of cocaine in violation of 21 U.S.C. § 841(a)(1) (1988). The jury was unable to reach a verdict on the charge that Segura–Gallegos carried a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c) (1988). The district court dismissed the weapons count. Segura–Gallegos was sentenced to eighty-seven months imprisonment and four years' supervised release on March 30, 1992.

Segura–Gallegos claims that there was insufficient evidence to support his convictions, that the trial court erred in cancelling a mistrial, and that hearsay testimony was improperly admitted against him. We affirm.

I. *Sufficient Evidence*

Segura–Gallegos claims that the evidence is insufficient to support his conviction for conspiracy, and that because he "possessed" cocaine only as a member of the conspiracy, his conviction for possession must fail as well.

■ "In considering a challenge to the sufficiency of the evidence, we decide 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a rea-sonable doubt.' " *United States v. Aichele,* 941 F.2d 761, 763 (9th Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). To obtain a conspiracy conviction, the government must prove that a conspiracy existed, and then " 'need only prove a "slight" connection between the defendant and the conspiracy.' " *Aichele,* 941 F.2d at 763 (quoting *United States v. Baron,* 860 F.2d 911, 919 (9th Cir.1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989)).

No dispute exists as to these applicable legal standards. We recognize, however, that appellate judges may occasionally differ in applying the somewhat amorphous standard of whether any rational juror could have found guilt beyond a reasonable doubt. *See, e.g., United States v. Wiseman,* 25 F.3d 862, 867–71 (9th Cir.1994) (Alarcon, J., dissenting); *United States v. Cloughessy,* 572 F.2d 190, 191–92 (9th Cir.1977) (Wallace, J., dissenting). Nevertheless, to paraphrase *The Mikado,* our "object all sublime" is to "achieve in time," insofar as possible, consistent results. The factual situations which must be evaluated have innumerable variations. In deciding such cases, we compare the facts, viewed in the light most favorable to the prosecution, to other cases.

A. *Factual Background*

In August and September of 1991, Detective Clifford Morgan, an undercover officer of the Boise, Idaho police department, had a number of telephone conversations with Rafael Avila, a codefendant in this case, regarding the purchase of five kilograms of cocaine for $80,000. Avila sent Morgan samples of the cocaine, and Morgan sent money to Avila. Avila went to the home of another codefendant, Juan Rafael Anguiano, on Eustace Street in Pacoima, California, before mailing at least one of the samples to Morgan.

On October 1, 1991, Morgan and Avila spoke on the phone and arranged a multi-kilogram sale for October 4. On October 3, Morgan flew to Los Angeles and on October 4 he met Avila at a post office parking lot. After telephoning his source, Avila then

drove off and later returned to the post office with Anguiano, who waited in the truck while Avila spoke with Morgan. Avila told Morgan that Anguiano was the source of the cocaine.

Avila and Anguiano then left and drove to a house on Woodcock Street in Sylmar; both entered the house and then left in Avila's truck. The two drove to Anguiano's house on Eustace Street in Pacoima. Both men went inside the Eustace Street house, then drove back to the house on Woodcock Street in Sylmar. Avila left alone and drove back to Anguiano's Eustace Street house, parked by the curb, and went inside.

A short time later, a silver and burgundy van pulled into the Eustace Street driveway. Avila soon left the house carrying a brown paper bag, and walked toward the curb, looking over at the van and appearing to speak to its occupants. Avila entered his truck and drove to the post office; the van followed him closely the entire fifteen-minute trip. The van parked in the post office lot about one hundred feet away from Avila's truck.

Avila met Morgan in the post office. They walked to the truck, and Avila showed Morgan the contents of the brown paper bag: 995 grams of cocaine. Morgan gave an arrest signal and officers from across the street arrested Avila, seizing a loaded revolver and several rounds of ammunition. They also arrested the driver of the van, codefendant Eduardo Perez, and Segura–Gallegos, who was the passenger in the van. The officers found an automatic pistol in the pouch behind the driver's seat, within reach of both the driver and Segura–Gallegos. Codefendant Anguiano and another co-defendant, Miguel Angel Grado, were arrested later.

### B. *Evidence at Trial*

At trial, the government's evidence of Segura–Gallegos' connection to the conspiracy included the following: Segura–Gallegos lived at Anguiano's house, where the drugs were kept; Segura–Gallegos was the passenger in a van that arrived at the house; when Avila came out of the house with the paper bag of cocaine, Avila appeared to speak to the van's occupants; the van followed Avila's truck closely for fifteen miles on the way to the post office; Segura–Gallegos moved to the back of the truck on the way to the post office, in what a surveillance officer believed was an act of countersurveillance; the van parked a short distance, about one hundred feet, from the truck; Segura–Gallegos remained in the van, within reach of the automatic pistol in the pouch behind the driver's seat, during the interrupted cocaine transaction; and when the arrests began, he crouched down as if to hide. A United States Postal Inspector testified that in an interview the day of his arrest, the van driver, codefendant Perez, admitted that he had known that cocaine would be sold at the post office and that he was supposed to be a lookout.

Segura–Gallegos offered conflicting explanations of his actions which differ in some details from the government's version of his movements. After his arrest, Segura–Gallegos told the postal inspector that he had been living at Anguiano's Eustace Street address for six weeks to two months. At first, he maintained that he had not known he was following anyone while he rode in the van. Later in the interview, he admitted that he knew the van was following the truck. He stated that he was at home the day of the deal, and left the house to follow Avila's truck after he was instructed to do so by a telephone call. Segura–Gallegos also said that he knew a gun had been in the van the night before, but thought it was not in there that day. He stated that he had not known that he was there to provide protection, or that a cocaine deal was in the offing.

### C. *Analysis*

 Viewing the evidence in the light most favorable to the government, we find that the evidence of his guilt was sufficient for the jury to reject Segura–Gallegos' explanation. *See United States v. Bautista–Avila,* 6 F.3d 1360, 1363 (9th Cir.1993) (" 'When there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one.' " (quoting *United States v. Vasquez–Chan,* 978 F.2d

546, 549 (9th Cir.1992))). Segura–Gallegos lived at the source house, waited in a van in the driveway until Avila emerged with the cocaine and appeared to speak to the van's occupants, followed Avila's truck closely as a passenger in the van whose driver admitted he was a lookout and in which a weapon was readily available for use, and made movements in the van consistent with countersurveillance activity. He was present during the drug deal, when "counter-surveillance is most helpful and most common." *United States v. Mares*, 940 F.2d 455, 459 (9th Cir. 1991). During the deal, Segura–Gallegos remained in the van parked close to Avila's truck and within reach of a weapon, and he crouched down as if to hide during the arrest. After his arrest he gave conflicting statements about whether he was following the truck.

Our cases discussing the sufficiency of evidence of countersurveillance are very dependent upon the specific facts presented to the jury. The case closest in facts, which found that the government had presented insufficient evidence of countersurveillance activity, is distinguishable. Unlike the defendants in *United States v. Ramos–Rascon*, 8 F.3d 704 (9th Cir.1993), Segura–Gallegos was within reach of a weapon stored in the van. *See id.* at 707 (noting that weapons are commonly present in countersurveillance situations). Segura–Gallegos also remained in the van after it parked near Avila's truck, waiting while the drug deal took place; the defendants in *Ramos–Rascon* left the vehicle and sat chatting on a wall. *See id.* at 708 (finding that parking alleged countersurveillance vehicle near site of drug deal "might be of more than minimal importance had the appellants stayed inside the [vehicle]"). Finally, Segura–Gallegos lived in the house that was the source of the cocaine. While his residence in the house is not in itself sufficient evidence of conspiracy or possession, *see United States v. Vasquez–Chan*, 978 F.2d 546, 550–52, 553 (9th Cir.1992), it is a factor to be considered in weighing the sufficiency of the evidence. With the additional evidence detailed above, the facts in this case are stronger than the evidence found insufficient in *Ramos–Rascon*.[1]

We conclude that the government in this case presented sufficient evidence for a rational juror to find beyond a reasonable doubt that Segura–Gallegos was guilty of conspiracy and possession.

## II. *Cancellation of the Mistrial*

After several days of deliberation, the jury sent the judge a note that it had reached verdicts on all the counts except one. The trial judge called in the jury to receive its verdicts. The clerk read its verdicts as to Segura–Gallegos' codefendants, and the judge noted "we do not have a verdict form as to Mr. Segura." He then polled the jury on each of the three codefendants' convictions. The judge then asked the members of the jury whether they thought more time to deliberate would allow them to reach a verdict on Segura–Gallegos, and the jury foreperson replied "I do not believe we can possibly come to a verdict." When other jurors agreed, the judge sent them back to the jury room.

Segura–Gallegos' counsel requested a mistrial. The trial judge granted the motion. After discussing a possible retrial date, the judge called the jury back in. The judge explained to the jury that he had granted a mistrial, and thanked them for their hard work, telling them they could now talk to the lawyers. A juror interrupted him to tell him that the jury had in fact initially reached verdicts of guilty on two of the counts against

---

1. Other cases in which we have found insufficient evidence present weaker facts for upholding a conviction than *Ramos–Rascon*. *See, e.g., United States v. Wiseman*, 25 F.3d 862 (9th Cir. 1994); *United States v. Ocampo*, 937 F.2d 485 (9th Cir.1991); *United States v. Penagos*, 823 F.2d 346 (9th Cir.1987); *United States v. Lopez*, 625 F.2d 889 (9th Cir.1980); *United States v. Cloughessy*, 572 F.2d 190 (9th Cir.1977). We shall not belabor this opinion by detailing their facts other than to state that they are readily distinguishable from those in evidence against Segura–Gallegos. *See also United States v. Mares*, 940 F.2d 455 (9th Cir.1991); *United States v. Normandeau*, 800 F.2d 953 (9th Cir. 1986); *United States v. Batimana*, 623 F.2d 1366 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980); *United States v. Perez*, 491 F.2d 167 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974) (all finding sufficient evidence on facts of a comparable weight to those in this case).

Segura–Gallegos, and had been unable to reach a verdict only on the last count, which involved possession of a weapon during a drug trafficking crime. The judge immediately cancelled his mistrial order, asked the jury to read the verdict form, and stated for the record:

> I misunderstood the jury and believed that they were telling me that they could not reach a verdict at all as to Mr. Segura, one way or the other.
>
> I now find that the jury meant that they could not reach a verdict on one of the three counts as to Mr. Segura. With that I will cancel my order declaring a mistrial as to Mr. Segura, and will receive the jury's verdict as to Mr. Segura.

The clerk read the verdict on the conspiracy and possession counts, and the judge polled the jury with Segura–Gallegos' counsel's assent. The judge then declared a mistrial on the weapons count and excused the jury. Finally, the judge postponed setting a sentencing date for Segura–Gallegos pending a decision whether to retry him on the weapons count.

■ On appeal, Segura–Gallegos claims that the cancellation of the mistrial on the first two counts was reversible error, both because it prejudiced him and because the district court lacked jurisdiction to continue with the trial once he had discharged the jury. Because Segura–Gallegos' trial counsel did not object, the cancellation of the mistrial order is reviewed for plain error. *United States v. Dischner*, 974 F.2d 1502, 1515 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993). To reverse a conviction for plain error, we must find an actual error which is clear under current law. *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). The error must affect substantial rights. In most cases, this means the error must prove prejudicial in that it affected the outcome of the proceedings. *Id.* at ——, 113 S.Ct. at 1777–78. Finally, even if all the foregoing criteria are satisfied, we should exercise our discretion to correct the error only if a miscarriage of justice would otherwise result. *Id.* at ——, 113 S.Ct. at 1778–79.

■ No actual error occurred here. During the initial reading of the verdicts, the trial judge misunderstood the jury's statement that it could not reach a verdict on the weapons count to mean that it could not reach a verdict on *any* count involving Segura–Gallegos. Based on his misunderstanding, and before he dismissed the jury, he granted a motion for mistrial. When he discovered his mistake, he cancelled his order, polled the jury, and declared the mistrial on the weapons count only, to reflect the true nature of the jury's deliberations. He then excused the jury. Until the jury is excused, the court may reconsider its intention to declare a mistrial. *United States v. Smith*, 621 F.2d 350, 352 n. 2 (9th Cir.1980), *cert. denied*, 449 U.S. 1087, 101 S.Ct. 877, 66 L.Ed.2d 813 (1981). The judge thus corrected rather than committed an error. Because he had not yet discharged the jury, the judge had jurisdiction to do so.

We find that no error occurred when the district judge cancelled the mistrial.

III. *Admitting the statements of co-conspirators*

Finally, Segura–Gallegos argues that the district court abused its discretion in admitting against him hearsay testimony regarding prior statements by Avila during the preparation for the cocaine deal, as well as the evidence that Avila sent an ounce of cocaine to Detective Morgan in Boise. He claims the statements and the evidence should not have been admitted against him because no conspiracy existed before October 4, when the actual deal was to take place.

■ Because Segura–Gallegos' counsel objected at trial, this court "review[s] for an abuse of discretion the district court's decision to admit co-conspirator statements and for clear error the underlying factual determination that a conspiracy existed and that the statements were made in furtherance of that conspiracy." *United States v. Arambula–Ruiz*, 987 F.2d 599, 607 (9th Cir.1993).

Under Federal Rule of Evidence 801(d)(2)(E), a co-conspirator's statement

during the course and in furtherance of the conspiracy is not hearsay and is admissible against other members of the conspiracy. Before admitting a statement of a co-conspirator into evidence against a defendant, the government must establish by a preponderance of the evidence the existence of the conspiracy and of the defendant's connection to it, and show that the statement was made during and in furtherance of the conspiracy.

*United States v. Crespo de Llano,* 838 F.2d 1006, 1017 (9th Cir.1987) (citation omitted).

Here the government showed by a preponderance of the evidence the existence of a conspiracy prior to October 4. In his earlier conversations with Detective Morgan, Avila made repeated reference to his "source" for the cocaine as well as to other individuals. With the surveillance reports detailing Avila's trips to Anguiano's Eustace Street home and other addresses, this evidence established that it was more likely than not that a conspiracy existed. Finally, Avila's statements to Detective Morgan were made during the conspiracy and in furtherance of the drug transaction.

As to whether Avila's statements were properly admitted, it does not matter that there was no evidence of Segura–Gallegos' participation in the conspiracy before October 4. Statements of his co-conspirators are not hearsay even if they were made before Segura–Gallegos entered the conspiracy. *United States v. Anderson,* 532 F.2d 1218, 1230 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). *See United States v. Murphy,* 852 F.2d 1, 8 (1st Cir.), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989); *United States v. Badalamenti,* 794 F.2d 821, 826–28 (2d Cir.1986). While statements of co-conspirators made prior to Segura–Gallegos' involvement are not admissible to show his *participation, United States v. Gee,* 695 F.2d 1165, 1169 (9th Cir.1983), here the statements did not refer to Segura–Gallegos and were not used for that purpose.

We find no clear error in the district court's finding that a conspiracy existed, and no abuse of discretion in the district court's admission of Segura–Gallegos' co-conspirators' statements.

We also find that the district court did not abuse its discretion in admitting the evidence that Avila mailed cocaine to Boise. That act was in furtherance of the conspiracy and was admissible in evidence against Segura–Gallegos as a member of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

We AFFIRM Segura–Gallegos' conviction.