116 F.3d 486
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Larry Darvell HENRICKS, Defendant-Appellant.
 No. 95-30354.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 6, 1997
Decided June 3, 1997.
 
 1
 Appeal from the United States District Court for the District of Montana, No. CR-94-38-JDS; Jack D. Shanstrom, District Judge, Presiding
 
 
 2
 BEFORE: CANBY and TASHIMA, Circuit Judges, and SILVER,** District Judge I.
 
 
 3
 MEMORANDUM*
 
 
 4
 Larry Darvell Henricks ("Henricks") was convicted by a jury of conspiracy to distribute marijuana, cocaine, and methamphetamine, possession with intent to distribute and/or distribution of methamphetamine, possession with intent to distribute and/or distribution of marijuana, distribution of cocaine, possession of cocaine with intent to distribute, and unlawful use or carrying of a firearm during and in relation to a drug trafficking offense in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, 18 U.S.C. § 924(c), and 18 U.S.C. § 2. Henricks now appeals his conviction and sentence. We affirm.
 
 II.
 
 5
 On November 21, 1994, an initial grand jury indictment was issued against Henricks. On March 16, 1995, Henricks was indicted by a Third Superseding Indictment. Henricks was charged with conspiracy to distribute marijuana, cocaine and methamphetamine (Count 1), possession with intent to distribute and/or distribution of methamphetamine (Count 2), possession with intent to distribute and/or distribution of marijuana (Count 3), distribution of cocaine (Counts 4-6), possession of cocaine with intent to distribute (Count 7), and unlawful use or carrying of a weapon during and in relation to a drug trafficking offense (Counts 8-9). Henricks was alleged to be a member of the Osuna drug conspiracy operating in Billings, Montana. During the trial, numerous individuals implicated in the Osuna conspiracy testified as Government witnesses.
 
 
 6
 On July 20, 1995, the jury returned a guilty verdict on all nine counts. On October 13, 1995, the district court sentenced Henricks to a term of 360 months imprisonment on Counts 1-7 and 60 months imprisonment on Counts 8-9 to run consecutively, and 60 months of supervised release. Henricks timely appealed his conviction and sentence.
 
 III.
 
 7
 Henricks argues that the district court erred in admitting as co-conspirator statements Victoria Castro's testimony of Pete Osuna's statements implicating Henricks's drug-selling and gun-purchasing activities.[1]
 
 
 8
 We review the district court's decision to admit co-conspirator statements under Fed.R.Evid. 801(d)(2)(E) for abuse of discretion and the underlying factual determination that a conspiracy existed and that the statements were made in the course and in furtherance of that conspiracy for clear error. United States v. Arambula-Ruiz, 987 F.2d 599, 607 (9th Cir.1993). It is undisputed that because Henricks's trial counsel failed to object to the admission of Osuna's statements concerning Henricks's firearm activity, the admissibility of Osuna's firearm statement must be analyzed under plain error.
 
 
 9
 An out-of-court statement by a co-conspirator is admissible if the Government establishes by a preponderance of the evidence: (1) the existence of a conspiracy, (2) the defendant's connection to the conspiracy, (3) that the statement was made in furtherance of the conspiracy, and (4) that the statement was made during the course of the conspiracy. United States v. Segura-Gallegos, 41 F.3d 1266, 1272 (9th Cir.1994); United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir.), cert. denied, 510 U.S. 937 (1993).
 
 
 10
 A. Independent Evidence of Connection to Conspiracy
 
 
 11
 Henricks does not dispute that the Government sufficiently demonstrated the existence of the Osuna conspiracy, which was designed in part to distribute drugs within the Billings, Montana area. Henricks also does not contest that Pete Osuna's statements were made during the existence of the Osuna conspiracy from mid to late 1993 to August 5, 1994. Instead, Henricks argues that the Government failed to present sufficient evidence for the trial court to determine by a preponderance of the evidence that Henricks had knowledge of and participated in the Osuna conspiracy, preliminary facts that must be established in order for out-of-court co-conspirator statements to be admitted under Fed.R.Evid. 801(d)(2)(E). United States v. Silverman, 861 F.2d 571, 576 (9th Cir.1988) ("An accused's knowledge of and participation in an alleged conspiracy are preliminary facts that must be established before extrajudicial statements of a co-conspirator can be introduced into evidence."); see Bourjaily v. United States, 483 U.S. 171, 175 (1987). Henricks contends that the only witness who provided testimony even slightly connecting Henricks to the Osuna conspiracy was Victoria Castro and that her testimony is presumptively unreliable because she testified that Henricks committed various acts in furtherance of the conspiracy at a time when he was still in Montana state prison.
 
 
 12
 Henricks's argument is flawed because it assumes incorrectly that the Government did not present any independent evidence, slight or substantial, to corroborate Osuna's statements implicating Henricks in the conspiracy. To the contrary, the Government presented substantial evidence supporting the proposition that Henricks had knowledge of and participated in the conspiracy. To illustrate, the Government presented the following independent evidence of Henricks's participation and connection with the conspiracy: (1) a money wire to California jointly sent by Castro and Henricks; (2) a drug ledger belonging to Shane Tuttle, a member of the Osuna conspiracy, listing Henricks's drug debt to Tuttle; (3) Tuttle's drug ledger, which revealed that Henricks's drag debt to Tuttle had been reduced by Henricks's procurement of a .40 caliber Glock handgun later used by Tuttle to intimidate a Montana law enforcement officer during a drug transaction; (4) Tuttle's statement to Agent Magnuson of the Montana Narcotics Investigation Bureau that he first met Henricks at Castro's residence while Henricks was meeting with Pete Osuna; (5) Tuttle's testimony that he distributed multiple ounces of methamphetamine to Henricks; (6) testimony that Tuttle used a vehicle registered to Henricks in a drug transaction; and (7) the testimony of a variety of individuals to whom Henricks distributed methamphetamine during the period of the conspiracy. Additionally, Castro testified that she engaged in face-to-face meetings with Henricks in various parking lots to collect Henricks's unpaid drug debts. She also testified that the money wire jointly sent by Henricks and herself was at the direction of Pete Osuna, one of the leaders of the Osuna conspiracy. Further, Castro testified that she saw Henricks, Pete Osuna, and other members of the Osuna conspiracy "cutting up" drugs for distribution at her home.
 
 
 13
 Although Henricks attempts to discredit Castro's testimony by claiming that she testified that Henricks committed various acts in furtherance of the conspiracy at a time when he was still in Montana state prison, our review of the trial transcript suggests otherwise. When asked how long Henricks sold drugs for Pete Osuna, Castro responded that he did so until early winter or the middle of winter. A review of the record reveals that Castro was referring to the end of 1993 as the point in time in which Henricks stopped selling drugs, for Pete Osuna (and began selling drugs for Andy Osuna, Pete's brother). Thus, Henricks's assumption that Castro testified about the time in which Henricks began selling drugs for Pete Osuna is incorrect. Similarly, Henricks's contention that Castro was referring to the winter of 1992-93 instead of the winter of 1993-94 is unsupported by the record. In any event, the Government did not rely solely upon Castro's testimony to corroborate Pete Osuna's statements. Taken as a whole, the Government's independent evidence proffered at trial was sufficient to connect Henricks to the Osuna conspiracy.
 
 B. In Furtherance
 
 14
 Henricks also challenges the district court's finding that the "in furtherance" requirement of Rule 801(d)(2)(E) was met by the Government's evidence. Henricks contends that Pete Osuna's comments about Henricks's role in purchasing guns and selling drugs were merely narrative declarations of past events, which were irrelevant to any of the conspiracy's ongoing activities. In support, Henricks relies upon United States v. Yarbrough, 852 F.2d 1522 (9th Cir.), cert. denied, 488 U.S. 866 (1988), which stated that "[m]ere conversations between co-conspirators, or merely narrative declarations among them, are not made 'in furtherance' of a conspiracy." Id. at 1535. In response, the Government contends that Pete Osuna's statements to Castro were not merely narrative declarations of past events, but rather "statements made to keep coconspirators abreast of an ongoing conspiracy's activities." Id. at 1536. The Government claims that Pete Osuna's statements, which identified Henricks as the person actively selling the Osuna conspiracy's drugs and actively obtaining the Osuna conspiracy's guns, were designed to inform Castro about ongoing activities within the Osuna organization. We are persuaded by the Government's argument. Under Yarbrough, statements designed to inform co-conspirators about ongoing activities within the conspiracy satisfy the "in furtherance" requirement. Yarbrough held that in order for statements to be "in furtherance" of a conspiracy, they must "further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." Id. at 1535.
 
 
 15
 We have also stated that in determining whether a statement is made "in furtherance" of a conspiracy, the declarant's intent in making the statement should be the focus of the court's inquiry. United States v. Williams, 989 F.2d 1061, 1068 (9th Cir.1993); Arias-Villanueva, 998 F.2d at 1502. Contrary to Henricks's position, the statements of Pete Osuna are indicative of his intent to inform Castro about ongoing activities within his criminal organization. Castro played a significant and multi-faceted role within the Osuna organization by delivering drugs for the Osuna conspiracy, sending drug proceeds to Pete Osuna through wire transfers to California, collecting drug debts owed to the Osuna conspiracy, and by allowing her home to be used as a location where drug-related activity such as "cutting drugs" took place. In addition, Castro's working relationship with Pete Osuna coincided with Henricks's involvement with Pete Osuna. Thus, Pete Osuna was not referring to a former drug seller when he spoke about Henricks's involvement. Because of Castro's heavy involvement in the Osuna conspiracy, Pete Osuna's statements to Castro regarding Henricks's involvement in the conspiracy are consistent with an intent to keep her informed about ongoing activities within the Osuna organization. The timing of Pete Osuna's statements also suggests that Henricks's involvement was mentioned to illustrate the conspiracy's ongoing activities. Finally, Henricks has failed to cite any portion of the record demonstrating that Pete Osuna's statements to Castro were simply declarations of past events unrelated to ongoing activities.
 
 
 16
 As for Henricks's contention that Osuna's statement regarding Henricks's gun-purchasing activity was "mere narrative conversation" because Castro admitted at trial that she had no personal involvement with the Osuna conspiracy's firearms, Henricks's argument is similarly unpersuasive. Castro's lack of personal contact with guns purchased by Henricks for the conspiracy does not make Osuna's statement about Henricks's role in purchasing the guns unrelated to ongoing activities. On the basis of Castro's significant participation within the Osuna conspiracy, one would expect Castro to be informed about other aspects of the conspiracy of which she did not have personal contact.
 
 
 17
 In light of the deference given to a trial court's finding that a statement was made in furtherance of a conspiracy, United States v. Miller, 771 F.2d 1219, 1233 (9th Cir.1985) ("We will not disturb the trial court's finding on this question unless the judge could not reasonably have come to that conclusion."), and in light of the evidence presented, the district court's "in furtherance" finding will not be disturbed.
 
 C. Confrontation Clause Challenge
 
 18
 We have previously held that in light of the Supreme Court's holding in Bourjaily that the requirements of Fed.R.Evid. 801(d)(2)(E) and the Sixth Amendment's Confrontation Clause are identical, 483 U.S. at 183-84, no violation of the Confrontation Clause exists as long as the requirements of Rule 801(d)(2)(E) are met. Yarbrough 852 F.2d at 1536. Although Henricks raises a Confrontation Clause challenge to the admission of Pete Osuna's statements, the proper admission of Pete Osuna's statements under Rule 801(d)(2)(E) precludes this argument.
 
 IV.
 
 19
 Henricks challenges the sufficiency of the evidence proffered by the Government in support of his conviction. In support, Henricks contends that: (1) law enforcement officers did not find Henricks in possession of any drugs or firearms on his person or in his property at the time of his arrest on November 30, 1994; (2) law enforcement officers did not find any of Henricks's fingerprints on any drugs; (3) Henricks was not present at any drug transaction at the time of arrest; and (4) witnesses who did not enter into any plea-bargain testified that they had never seen Henricks with any guns and that they were not aware of any drug activities.
 
 
 20
 "In considering a challenge to the sufficiency of the evidence, the court must decide 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Aichele, 941 F.2d 761, 763 (9th Cir.1991) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In reviewing evidence, we must respect the exclusive province of the trier of fact to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. United States v. Ginn, 87 F.3d 367, 369 (9th Cir.1996).
 
 A. Conspiracy
 
 21
 Henricks was charged with conspiracy to distribute marijuana, cocaine, and methamphetamine in violation of 21 U.S.C. § 846. The elements of conspiracy are: (1) an agreement to commit a crime, and (2) knowledge of the conspiracy's objects and intent to help further them. United States v. Gil, 58 F.3d 1414, 1423 (9th Cir.), cert. denied, 116 S.Ct. 430 (1995). An agreement can be inferred from the defendant's acts or from other circumstantial evidence. United States v. Lennick, 18 F.3d 814, 818 (9th Cir.), cert. denied, 513 U.S. 856 (1994). The Government must prove only a slight connection between the defendant and the conspiracy. Aichele, 941 F.2d at 763; United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991) ("Evidence of even a slight connection, if proven beyond a reasonable doubt, is sufficient to convict a defendant of knowingly participating in an established conspiracy.... Such a connection to a conspiracy may be inferred from circumstantial evidence.").
 
 
 22
 Although Henricks correctly points out that "proof that a defendant sold drugs to other individuals does not prove the existence of a conspiracy," Lennick, 18 F.3d at 819, the evidence supporting Henricks's conspiracy conviction is not limited to such proof. For example, Osuna's statements, admissible under Fed.R. Evid. 801(d)(2)(E), directly implicate Henricks in the Osuna conspiracy as one of the main sellers of drugs and purchasers of firearms. In addition, the Government introduced Castro's testimony that pursuant to Pete Osuna's request, Henricks assisted her in wiring "drug money" to Osuna's California operation in December 1993. Conceding that Castro and he filled out the wire transfer form, Henricks contends that he did not know that the wired funds were involved with the illicit drug trade. Henricks fails to recognize that a reasonable trier of fact was entitled to reject Henricks's explanation for filling out the wire transfer form. Moreover, the admission of Pete Osuna's statements under Fed.R. Evid. 801(d)(2)(E) undermines Henricks's discounting of Castro's testimony as "incredulous." Therefore, the evidence connecting Henricks to the Osuna conspiracy easily surpasses the slight evidence threshold.
 
 
 23
 B. Possession of Narcotics with Intent to Distribute
 
 
 24
 In order to prove the crime of possession of narcotics with intent to distribute, the Government must prove beyond a reasonable doubt that the defendant: (1) knowingly, (2) possessed the narcotics, (3) with an intent to distribute them. United States v. Ocampo, 937 F.2d 485, 488 (9th Cir.1991). Although Henricks contends that the Government failed to demonstrate that he ever had actual or constructive possession of any drugs, this argument is misleading. The jury was properly instructed that Henricks could be convicted of possession if he either directly possessed the drugs in question or if he aided and abetted the possession by others. "Under 18 U.S.C. § 2, one who aids and abets is as responsible for that act as if he had committed it directly." United States v. Vasquez-Chan, 978 F.2d 546, 552 (9th Cir.1992). "To be guilty of aiding and abetting another person, it is necessary that the defendant in some sort associate himself with the venture, that he participate in it as something that he wished to bring about, that he seek by his action to make it succeed." Id. (citations omitted). Thus, the relevant inquiry is not whether Henricks had actual possession of any drugs, but rather whether he intentionally participated in the Osuna conspiracy with the intent to further the goals of the organization, which were possession of narcotics with the intent to distribute.
 
 
 25
 As previously mentioned, the Government proffered Castro's testimony, which included out-of-court statements by Pete Osuna regarding Henricks's major drug-selling role in the Osuna conspiracy. Castro also testified that Henricks assisted her in wiring "drug money" to Osuna's California operation in December 1993. Castro additionally testified that she viewed Henricks, Pete Osuna, and other members of the Osuna conspiracy "cutting up" drugs for distribution in her bedroom. The combined weight of the Government's proof is sufficiently probative to infer that Henricks willingly participated in the Osuna conspiracy and intended for it to succeed. Henricks's fleeting comment that the Government's evidence did not show the mens rea for the aiding and abetting offense is without merit. One can easily infer from the evidence in the record that Henricks intended actively to participate in the Osuna conspiracy in a manner that would enhance the conspiracy's goals.
 
 
 26
 Henricks may be criminally responsible for the conduct of the other co-conspirators under a similar theory. We held that even if a defendant did not actually possess the drugs, his co-conspirators' possession would thereby render the defendant inconstructive possession. United States v. Kearns, 61 F.3d 1422, 1424 (9th Cir.1995). Henricks concedes that the Government proved a drug conspiracy involving Pete Osuna and other individuals by their prior guilty pleas and convictions. At least one of the co-conspirators, Shane Tuttle, pled guilty to charges stemming from his role as a distributor of drugs for the Osuna conspiracy. The drugs serving as the basis for Henricks's drug-related counts were seized from members of the Osuna conspiracy. In light of the evidence implicating Henricks as a member of the Osuna conspiracy, Henricks was in constructive possession of drugs actually possessed by other co-conspirators. Therefore, Henricks's challenge to the sufficiency of evidence regarding his conviction for possession of various drugs with intent to distribute must fail.
 
 C. Firearm Counts
 
 27
 Henricks presents a very limited challenge to the sufficiency of the evidence relating to the firearm counts. He argues only that there was insufficient evidence from non-plea-bargaining witnesses to connect him in any way with guns.[2] The jury, however, was entitled to accept the evidence of plea-bargaining witnesses, and there was ample evidence connecting Henricks to guns. Pete Osuna's statement that Henricks was the purchaser of firearms for the Osuna conspiracy, the testimony of various individuals that Henricks frequently carried firearms, and testimony that Henricks procured a .40 caliber Glock handgun for Tuttle which was later used to intimidate a Montana law enforcement officer during a drug transaction linked Henricks to the guns either as a principal or as an aider and abettor. We therefore reject Henricks' contention.
 
 V.
 A. Improper Vouching
 
 28
 Henricks contends that the Government's prosecutor impermissibly vouched for the credibility of the Government's witnesses both during the prosecutor's direct examination and during the prosecutor's closing argument. Henricks argues that the jury was informed that the Government witnesses would receive a reduction in their sentences pursuant to Fed.R.Crim.P. 35 only if they cooperated fully and that they would be charged with perjury if they gave untruthful testimony. Henricks relies upon the following exchange between the prosecutor and Victoria Castro on direct examination as illustrative of the vouching that occurred:
 
 
 29
 Q. Pursuant to that plea agreement, did you agree to cooperate with the government?
 
 
 30
 A. Yes.
 
 
 31
 Q. And by cooperate, what did that mean?
 
 
 32
 A. Get a lesser sentence.
 
 
 33
 Q. Were there any stipulations or requirements about your cooperation?
 
 
 34
 A. I--
 
 
 35
 Q. You are not following?
 
 
 36
 A. No.
 
 
 37
 Q. Is it correct that you agreed to provide truthful testimony?
 
 
 38
 A. Yes.
 
 
 39
 Q. Do you have an understanding about what can happen to you if you do not provide truthful testimony?
 
 
 40
 A. Yes.
 
 
 41
 Q. What can happen to you?
 
 
 42
 A. Get more of a sentence.
 
 
 43
 Q. I'm sorry?
 
 
 44
 A. Get more of a sentence.
 
 
 45
 Q. And you can be prosecuted for perjury?
 
 
 46
 A. Yeah.
 
 
 47
 In terms of the alleged vouching occurring during the prosecutor's closing argument, Henricks relies upon the following statement:
 
 
 48
 But ladies and gentlemen, the requirement is that these people provide truthful testimony. If they are found to be lying on that stand, there will be no Rule 35. And ladies and gentlemen, the government doesn't give them a Rule 35. That decision will ultimately rest with the court. I cannot do that. The decision will rest with the court. So yes, these people have incentive to come before you and to testify.
 
 
 49
 Henricks did not object to the prosecutor's comments in argument or colloquy with Castro at trial. Henricks argues that without the alleged vouching testimony, the evidence of Henricks's guilt "disappears." Simply put, Henricks challenges the existence of any substantial evidence of guilt apart from the testimony of the Rule 35 witnesses.
 
 
 50
 Although the prosecutor concedes that she erroneously vouched for the credibility of some of the Government's witnesses on direct examination,[3] see, e.g., United States v. Wallace, 848 F.2d 1464, 1474 (9th Cir.1988) (holding that it is improper to allow the prosecution to elicit testimony on direct examination regarding the truthfulness requirement of a plea agreement), she maintains that the vouching was not plain error because there was significant, independent evidence of Henricks's guilt. Moreover, the district court issued extensive curative instructions both before the Government's examination of the Rule 35 witnesses and after.
 
 
 51
 Improper vouching occurs when the prosecutor places the prestige of the Government behind the witness by providing personal assurances of the witness's veracity. "As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." United States v. Williams, 989 F.2d 1061, 1071 (9th Cir.1993). Statements by the prosecutor vouching for the credibility of witnesses are reviewed for plain error if the defendant did not object at trial to the prosecutor's statements. United States v. Perez, 67 F.3d 1371, 1378 (9th Cir.1995), reh'g en banc granted, 77 F.3d 1210 (9th Cir.1996); United States v. Young, 470 U.S. 1, 14 (1985). There are three limitations to appellate review conducted under plain error: (1) there must be an error; (2) the error must be plain; and (3) the error must affect substantial rights. United States v. Olano, 507 U.S. 725, 732-34 (1993). In most cases, the plain error must be prejudicial, that is, it "must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. The defendant bears the burden of persuasion with respect to prejudice. Id. Even if plain error occurred, a case requires reversal only to prevent a miscarriage of justice or where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 736.
 
 
 52
 We have previously announced a nonexclusive set of factors that should be considered in analyzing the effects of vouching. This list includes:
 
 
 53
 the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.
 
 
 54
 United States v. Necoechea, 986 F.2d 1273, 1278 (9th Cir.1993). When reviewing for plain error, we must "balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case." Id. These factors must be interpreted within the framework of the Supreme Court's holding in Olano. 507 U.S. at 734 ("It must have affected the outcome of the district court proceedings.").
 
 
 55
 We conclude that the prosecutor's remarks, viewed in the context of the entire trial, did not cause prejudice to Henricks. First, the district court's curative instructions were extensive. For example, the district court initially instructed the jury during voir dire about the potential motives of Rule 35 witnesses testifying:
 
 
 56
 There are also witnesses that are under what we call a Rule 35. And that's if a witness renders substantial assistance to the government, the court in the future, can come in and reduce the sentence of a defendant. Some of the witnesses that are going to be testifying in this case have pled guilty to various counts and have been sentenced by this court. They will probably be witnesses in this case. And, again, you will have to evaluate their testimony. And one of the criteria that you will use is the instruction I just gave you. What do they have to gain from the testimony.
 
 
 57
 After the conclusion of argument, the district court instructed the jury to examine with "greater caution" the testimony of witnesses who have received "benefits or favored treatment from the government in connection with this case or another case in which the witness was charged with criminal conduct." Thus, the district court's issuance of curative instructions dissipated the potential harm arising from the vouching.
 
 
 58
 Second, the evidence independent of the tainted testimony was substantial. Henricks's assistance with the wire transfer to California is probative of his guilt. In addition, co-conspirator Shane Tuttle's drug ledger revealed that Henricks's drug debt to Tuttle was reduced by Henricks's provision of a .40 caliber Glock handgun later used by Tuttle to intimidate a Montana law enforcement officer during a drug transaction. Further, Rose Bargar, Henricks's aunt, testified that she purchased methamphetamine from Henricks, acted as a middle person for Henricks's drug-selling activities, and saw Henricks carry a handgun. Jim Filaggi testified that Henricks gave him methamphetamine to sell to others. Henricks, himself, testified that he sold drugs to Jim Filaggi, his aunt, and uncle, and bought drugs from Shane Tuttle, a member of the Osuna conspiracy. Taken as a whole, substantial independent evidence exists to connect Henricks to the Osuna conspiracy.
 
 
 59
 Third, the form of vouching utilized by the prosecutor is best described as mild. Necoechea, 986 F.2d at 1278 (noting that while the prosecutor's statement that a witness who entered into a plea agreement agreed to testify truthfully constitutes vouching, the statement "mildly" implies that the government can guarantee the witness's truthfulness). The prosecutor did not mention her personal opinion or the court's opinion regarding the Rule 35 witnesses' veracity. Nor did the prosecutor imply that she had extra-record knowledge of the witnesses' truthfulness.
 
 
 60
 Fourth, Henricks's defense counsel raised the Government witnesses' Rule 35 motivation to lie throughout his closing statement. Defense counsel advised the jury to consider the testimony of the Government witnesses exceptionally critically regarding their motivation to testify.
 
 
 61
 Although Henricks argues that the prosecutor committed further vouching in closing argument by making references to the district court's role in the Rule 35 proceedings, Henricks's contention is misleading. The prosecutor's comments during her closing argument did not imply that the district court believed that the Government's witnesses were trustworthy. The prosecutor mentioned the court to clarify that the court, not the prosecutor, had the authority to reduce sentences pursuant to Fed.R.Crim.P. 35. This statement "did not suggest that the court had already passed judgment on the credibility of the witnesses." Perez, 67 F.3d at 1379.
 
 
 62
 Henricks's reliance upon United States v. Smith, 962 F.2d 923 (9th Cir.1992), is misplaced. In that case, we observed that invoking the integrity of the court is qualitatively different frog invoking the integrity of the prosecutor. Id. at 936. Here, the prosecutor did not invoke the integrity of the court in vouching for the truthfulness of the Rule 35 witnesses. She merely clarified that the Government lacks the authority to reduce the sentences of Rule 35 witnesses.
 
 
 63
 On balance, the strength of the district court's curative instructions and the substantial nature of independent evidence of guilt outweigh the mild form of vouching that occurred in the instant case. Therefore, we conclude that the prosecutor's improper vouching did not prejudice or affect the outcome of the district court proceedings. Olano, 507 U.S. at 734.
 
 B. Defendant's Monthly Income
 
 64
 Although Henricks also appears to claim that the prosecutor committed misconduct by misstating evidence of Henricks's monthly income, Henricks failed to specifically address how he was prejudiced as a result of this alleged conduct and Henricks made no objection to the prosecutor's purported misconduct. Moreover, the Government properly responds by pointing to specific locations within the trial transcript, which served as the basis for the Government's estimate of Henricks's monthly income. Thus, Henricks has failed to demonstrate that the prosecutor's purported misstatement of his monthly income constitutes reversible error.
 
 VI.
 
 65
 Henricks argues for the first time on appeal that the district court committed reversible error by allowing evidence of "massive amounts" of controlled substances to be displayed before the jury throughout his trial although he had no connection to the conspiracy. In particular, Henricks contends that the "drug table," which consisted of all drugs and certain firearms seized by the Montana Narcotics Investigation Bureau from the Osuna conspiracy, was irrelevant to his case because the displayed items had no connection to him. Further, Henricks maintains that because the "drug table" tended to incite the emotions of the jury and confused the issues, the "drug table's" admissibility was substantially outweighed by the risk of unfair prejudice. Fed.R.Evid. 403.
 
 
 66
 We do not review evidentiary rulings in the absence of a timely objection unless the accused's substantial rights are affected. United States v. Rogers, 769 F.2d 1418, 1425 (9th Cir.1985), cert. denied, 502 U.S. 973 (1991). Plain error requires a reversal only to prevent a miscarriage of justice or where the error seriously, affects the fairness, integrity, or public reputation of judicial proceedings. Olano, 507 U.S. at 736.
 
 
 67
 Moreover, Henricks's assumption that he had no personal connection to the displayed drugs and firearms is totally at odds with the proof of his involvement in the conspiracy. Contrary to Henricks's assumption, sufficient evidence of Henricks's role in the Osuna conspiracy existed in this case. See supra pp. 5-6. Therefore, the evidence displayed on the "drug table" was relevant to Henricks's case. See United States v. Gonzalez, 933 F.2d 417, 427 (7th Cir.1991) (display of seized cocaine is relevant to establishing the magnitude of the conspiracy).
 
 
 68
 Finally, as for the contention that the relevancy of the display of drugs and firearms was substantially outweighed by potential prejudice, Henricks simply has not met this threshold. The record is barren of any facts on this issue. Although Henricks cited United States v. Gonzalez, supra, and United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir.1988), for the propositions that: (1) the display of demonstrative evidence of drugs should be limited in time, and (2) jurors should be instructed to consider such evidence for a limited purpose, both cases are distinguishable because neither court reviewed for plain error. The defendants in Gonzalez and Arango-Correa made timely objections to the display of cocaine. Gonzalez, 933 F.2d at 426; Arango-Correa, 851 F.2d at 59. In contrast, under the plain error doctrine, Henricks must demonstrate that the outcome of his trial would have been different had the district court not displayed the "drug table" throughout his trial. Henricks has failed to meet this burden.
 
 VII.
 
 69
 Henricks contends that the district court committed reversible error by refusing to provide a jury instruction based on United States v. Lennick, supra, where we stated that the mere proof of sales of drugs to other individuals does not establish a conspiracy to distribute or possess with intent to distribute a controlled substance. Lennick, 18 F.3d at 819.
 
 
 70
 "A defendant is entitled to an instruction concerning his theory of the case if it is supported by law and has some foundation in the evidence. So long as the instructions given fairly and adequately cover the issues presented, the formulation of the instructions or choice of language is a matter within the trial court's discretion." Miller, 771 F.2d at 1238 (citation omitted). The district court's jury instructions are reviewed de novo. United States v. Sarno, 73 F.3d 1470, 1485 (9th Cir.1995), cert. denied, 116 S.Ct. 2555 (1996).
 
 
 71
 The district court refused Henricks's proposed instruction because it found that the conspiracy instructions given covered the defense theory. The court's conspiracy instruction made it clear that more than a mere sale of drugs is needed to find a conspiracy. The instruction stated that an agreement to do something unlawful was required. In addition, the instruction stated that the mere fact that the conspirators acted in similar ways does not establish a conspiracy. It is reasonable to construe the conspiracy instructions as setting forth the defense theory under Lennick. Therefore, Henricks's proposed jury instruction was properly denied by the district court.
 
 VIII.
 
 72
 Henricks contends that his sentencing enhancement, based upon his three prior felony convictions in Montana state court, was "inherently unfair" because he was not warned by the state court judges that his plea agreements could later be used to enhance his federal sentence. Henricks's contention is without merit. First, Henricks has cited no case authority in support of his position. Second, if a defendant challenges his state court convictions obtained through plea agreements, such pleas are examined by federal courts solely to assess whether the defendant made a voluntary and intelligent choice to waive the following constitutional rights: (1) the right to a jury trial, (2) the right to confront one's accusers, and (3) the privilege against self-incrimination. United States v. Ullyses-Salazar, 28 F.3d 932, 939 (9th Cir.1994). Henricks does not complain that he was denied any of these constitutional rights. Therefore, Henricks's sentencing challenge is without merit.
 
 
 73
 Although Henricks also challenges his 420-month sentence on the ground that it is disproportionate in comparison to the sentences received by the other defendants implicated in the Osuna conspiracy, Henricks does not acknowledge that the other defendants entered into plea agreements and received adjustments for acceptance of responsibility. Henricks was tried and convicted by a jury. Under these circumstances, Henricks has failed to demonstrate that his sentence was impermissibly disproportionate.
 
 
 74
 AFFIRMED.
 
 
 
 **
 The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The co-conspirator statements of Osuna are as follows:
 Q When you first started working for Pete at some point in the summer of '93, did you ever learn if other people were working for Pete?
 A Yes.
 Q Were other people selling drugs for Pete?
 A Yes.
 Q Did Pete ever tell you who, during that period of time, his main seller was here in Billings?
 A Yes.
 Q And what did Pete Osuna tell you about that?
 MR. BECKER: Object as hearsay.
 MS. BRINEY: Your Honor, under 801--
 THE COURT: Overruled.
 Q (By Ms. Briney:) You can answer.
 A Can you repeat that?
 Q You bet. Did Pete Osuna tell you who, during this period of time, was selling drugs for him, who in Billings?
 A He'd tell me a few people.
 Q Who did he tell you was selling drugs for him.
 A Well, when he first started, the main person he said was Larry.
 Q And is that the defendant in this case?
 A Yes.
 Q Larry Henricks?
 A Yes.
 Q And Pete Osuna told you that? A Yes.
 Regarding the Osuna conspiracy's source of firearms, which were used in California and Mexico, Castro testified as follows:
 Q Did Pete Osuna ever tell you who was supplying those guns to him here in Billings?
 A Yes.
 Q And what did Pete Osuna tell you?
 A I asked him, I said, where are you getting those, and he said from Larry.
 Q From the defendant?
 A Yes.
 
 
 [2]
 Henricks makes no contention that the evidence was insufficient to show "actual employment" of a weapon in relation to a drug trafficking crime, see Bailey v. United States, 116 S.Ct. 501, 506 (1995), or the "carrying" of a weapon in relation to such a crime, see United States v. Loaiza-Diaz, 96 F.3d 1335, 1336-37 & n. 2 (9th Cir.1996). We therefore do not address these issues
 
 
 [3]
 At oral argument, the Assistant United States Attorney who tried the case, in a commendable expression of candor, readily admitted she made a mistake which would not be repeated